# EXHIBIT KK

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| JDS FOURTH AVENUE LLC, | Case No. 21-10888 (KBO) |
| Debtor. | **Hearing Date: July 8, 2021 at 1:00 p.m. (ET)**<br>**Objections Due: June 24, 2021 at 4:00 p.m. (ET)** |

## LARGO 613 BALTIC STREET PARTNERS LLC'S MOTION
## TO DISMISS THE DEBTOR'S CHAPTER 11 CASE

Largo 613 Baltic Street Partners LLC ("Largo"), a 49% member of the debtor, JDS Fourth

Avenue LLC (the "Debtor" or "JDS Fourth"), hereby moves (the "Motion to Dismiss") for entry

of an order pursuant to §§ 305(a) and 1112(b) of Title 11 of the United States Code, 11 U.S.C.

§§ 101-1532 (the "Bankruptcy Code") dismissing the Debtor's chapter 11 case with prejudice

pursuant to 11 U.S.C. § 349(a) of the Bankruptcy Code: (i) because the petition was filed without

the requisite corporate authority; and/or (ii) for cause for failure to file the petition in good faith

and in the best interests of the Debtor and its creditors under 11 U.S.C. § 1112.  Largo also seeks

leave to file a motion for sanctions in the form of attorneys' fees pursuant to the parties' contractual

fee shifting agreement and Rule 9011 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").  Largo respectfully submits the supporting June 10, 2021 Declaration of

Nicholas Werner (the "Werner Decl.") attached hereto as Exhibit 1 and the June 10, 2021

Declaration of Attorney Craig Flanders (the "Flanders Decl.") attached hereto as Exhibit 2 and the

exhibits annexed thereto and represents as follows:

## PRELIMINARY STATEMENT

1.          This case is a transparent last ditch effort by developer and real estate investor, Michael Stern ("Stern"), to evade liability for diverting millions from the construction of a luxury condominium project located at 613 Baltic Street, Brooklyn, New York (the "Project") to benefit himself at the expense of the Project's investors.

2.          The timing and circumstances of the bankruptcy filing reveal Stern's egregious abuse of process.

3.          Stern, without any authority, caused this bankruptcy filing *less than 24 hours* prior to the commencement of trial in one New York state court action, the Tona Action (defined below), related to the Project where the Debtor, Stern, and his affiliates are defendants.  At the same time, with respect to a separate New York state court action, the Baltic Action (defined below), initiated by Largo against the Debtor, Stern, and his affiliates related to the Project, this bankruptcy action was conveniently timed to evade discovery sanctions, filed just minutes before a discovery conference on the heels of an Order to Show Cause for sanctions, which was filed one business day before this chapter 11 case was commenced.

4.          Critically, Stern and/or his affiliates lacked the authority to cause the Debtor to commence this bankruptcy case.  The Debtor is a limited liability company created and existing under Delaware law.  Pursuant to the Debtor's limited liability company agreement, all "Major Decisions," – which explicitly include "*Commencement by [JDS Fourth] of any Bankruptcy Action in respect of [JDS Fourth]*" – were **strictly subject to Largo's prior written approval**.  Largo never approved the Debtor's commencement of this chapter 11 case.  Indeed, neither the Debtor (nor anyone else) ever sought, let alone obtained, Largo's approval of the filing of the Debtor's

2

chapter 11 petition.  As such, the Court should dismiss this chapter 11 case for lack of subject matter jurisdiction.

5.      At the same time, the Debtor, acting through Stern and his affiliate, objectively could not have a good faith reason to believe that filing this bankruptcy action was in the best interests of the creditors.  The Debtor is a special purpose entity set up for the purpose of holding a membership interest in a joint venture subsidiary formed to own the Property (defined below) and manage the Project.  Perhaps highlighted best by the absence of any first day motions, the Debtor does not have independent operations or sources of income separate and apart from its rights in its subsidiary and upon information and belief has not had assets for several years.  The Debtor has no secured debt and, other than what is owed to Largo and the other Project investors, minimal unsecured debt that is all related to litigation services.  Its only business is to indirectly own the Project, which is complete.

6.      There is no possibility of reorganization and no legitimate reason for filing this chapter 11 bankruptcy petition.  Instead, the Debtor's chapter 11 bankruptcy petition was intended solely to hinder the Debtor's few creditors (investors in the Project and professionals retained to defend claims against Stern and his affiliates for diverting Project funds) from getting their day in court.

7.      At bottom, the underlying disputes (subject to years of state court proceedings in front of Justice Ostrager) are, in reality, two-party disputes between Stern and his affiliates, on the one hand, and the Project's investors, on the other hand.  Stern's abuse of his position as manager to divert and waste the Project's funds – millions of dollars since the filing of the first New York state court litigation – must end.  This chapter 11 case was filed in bad faith, without the requisite corporate authority, and should be dismissed for cause and with prejudice.

<u>**JURISDICTION AND VENUE**</u>

8.      The Debtor filed its voluntary chapter 11 petition on June 1, 2021 (the "<u>Petition Date</u>").

9.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. section 157(b).  Largo confirms its consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to Dismiss to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.      Venue of the Motion to Dismiss in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.      The statutory predicates for the relief requested herein are §§ 105(a), 305(a)(l), 349(a) and 1112(b) of the Bankruptcy Code and related Bankruptcy Rules, including Bankruptcy Rules 1017 and 9011.

<u>**BACKGROUND**</u>

A.      <u>**The Project Parties and Ownership Structure**</u>

12.      The Project's organizational/ownership structure is set forth in detail in the attached Organization Chart.  (*See generally* Werner Decl., Ex. A.)

4

13.    In sum:

- In December 2013, a joint venture, Fourth Avenue JV LLC ("Baltic JV") was created for the initial acquisition and management of the development of the Property.[1]

- Baltic JV, at all relevant times, has been owned: (i) 50% by the Debtor, a special purpose entity setup to hold such interests; and (ii) 50% by Baltic Fourth LLC ("Tonacchio Holdings") a special purpose entity owned and controlled by developer Dominick Tonacchio ("Tonacchio") and his family members.

- The Debtor is, in turn, owned (i) 51% by a special purpose entity, JDS Fourth Avenue JV II LLC ("Stern Holdings"), which is wholly owned by Stern; and (ii) 49% by Largo.

- Baltic JV indirectly owns the Property through a series of wholly owned subsidiaries. Specifically, Baltic JV owns 100% of Fourth Avenue Mezz LLC ("Fourth Avenue Mezz"), which, in turn, owns 100% of Fourth Avenue Property Owner LLC (the "Property Owner"), the ultimate owner of the Property.

(Werner Decl., ¶¶ 3-6.)

### B.    Management Control of the Debtor and Other Project Entities Opens Opportunity for Fraud and Abuse by Stern and His Affiliates

14.    The Debtor served as the "Manager" of Baltic JV, and therefore controlled the management of the various subsidiaries and thus the Project.  (April 24, 2014 Amended and Restated Limited Liability Company Agreement (the "Baltic Agreement"), Werner Decl., Ex. B.)

15.    JDS Construction Group LLC ("JDS Construction"), the construction arm and affiliate of Stern and his related entities, served as the construction manager for the Project, pursuant to a construction management agreement that was executed twice by Stern – once on behalf of the Property Owner and once on behalf of JDS Construction.  (See April 28, 2016 Construction Management Agreement, Werner Decl., Ex. C.) JDS Fourth Avenue Developer LLC ("JDS Developer"), the developer affiliate of Stern and his related entities, also served as the

---

[1] "Property" means, collectively, the property located at 613 Baltic Street, 615 Baltic Street, 617 Baltic Street, 107 Fourth Avenue, 109 Fourth Avenue, 109A Fourth Avenue, and 111-113 Fourth Avenue (Block 937, Lot 1) in Brooklyn, New York.

developer for the Project.  *Id.* at ¶ 10.

16.     Therefore, Stern (through control of the Debtor) effectively controlled and managed the financial infrastructure, construction, and development (through JDS Construction and JDS Developer) of the Project using equity contributions of other investors and loan proceeds guaranteed by assets owned, in part, by other investors.  *Id.* at ¶ 11.  Indeed, Stern, through his management and control of various subsidiaries effectively controlled all substantive management, construction, and development activities and approvals on the Project.  *Id.* at ¶ 12.

17.     As set forth in more detail below, Stern abused this position of power (and control of the Debtor and the other entities) to divert millions of dollars to his own pockets at the expense of his partners and investors, including Largo.  Stern's actions inevitably triggered multiple lawsuits – and rather than face the merits of those claims, Stern now seeks to evade the consequences of conduct by this improper bankruptcy filing.

### C.     Limitations on Stern's Management Control over the Debtor

18.     The various operating agreements for the Project entities, including the Debtor, contain restrictions, which were designed to act as checks and balances on the very abuses Stern perpetuated on this Project.

19.     Critically, for purposes of this case, the October 26, 2015 Amended and Restated Limited Liability Company Agreement (the "LLCA") expressly excludes from the Managing Member's powers, the authority to unilaterally commence a bankruptcy on behalf of the Debtor, stating:

Notwithstanding anything to the contrary contained in this Agreement, the prior unanimous written consent of Largo shall be necessary for all Major Decisions affecting the Company, it being understood that Managing Member **shall not cause the Company to take any action that constitutes a Major Decision without the prior unanimous written consent of Largo.**

(a) As used herein, a "Major Decision" shall mean any of the following actions: . . .

**(iii) Commencement by the Company of any Bankruptcy Action in respect of the Company . . . .**

(LLCA § 8.3(a)(iii), Werner Decl. Ex. D (emphasis added).)

20.    Furthermore, the LLCA indemnity provisions, executed by Stern personally and Stern Holdings, also provides:

To the fullest extent permitted by applicable law, the Company, Largo and its Affiliated Persons are hereby indemnified by JDS for any loss, damage or claim incurred by such Persons by reason of the gross negligence, criminal acts, willful misconduct, fraud, **voluntary or involuntary bankruptcy**, or any breach (including, failure an omission) of any provisions or representation of this Agreement, the Fourth Avenue JV Agreement and/or any other agreement of the Company or its Subsidiaries or Affiliates by JDS or any of its Affiliated Persons. By execution of this Agreement, the **JDS Principal [i.e. Stern] guaranties the indemnification set forth in this Section 7.9(b).**

*Id.* at § 7.9(b) (emphasis added).

21.    The LLCA further specifies that the limitation of liability as against the Managing Member "*shall not eliminate or limit the liability of such parties (a) for acts or omissions that involve fraud, gross negligence or a knowing and culpable violation of law, or (b) for any transaction not permitted or authorized under or pursuant to this Agreement from which such party derived a personal benefit*." *Id.* at § 7.3 (emphasis added).

### D. The Project Funds Disappear Without Explanation Causing Stern's Partners to Bring Suits For Stern's Misconduct

#### 1. The Tona Action

22.     In late 2018, Tonacchio Holdings filed an action against Stern, the Debtor, and others in an action originally styled, *Baltic Fourth LLC, directly and derivatively on behalf of Fourth Avenue JV LLC and Fourth Avenue Property Owner LLC, and Tona Construction & Management LLC v. Michael Stern, JDS Fourth Avenue LLC, and JDS Construction Group LLC et. al.*, Index No. 654881/2018, in New York Supreme Court, New York County, which complaint was later amended (the "Tona Action").  (Flanders Decl. at Ex. D (Amended Complaint filed in the Tona Action, dated December 21, 2018).)

23.     The plaintiffs in the Tona Action (the "Tona Action Plaintiffs"), allege, among other things, that Stern: (i) forged Tonacchio's name on lending documents as part of a scheme to install JDS Construction as the construction manager on the Project instead of a Tonacchio Holdings affiliate; (ii) fraudulently overcharged sums on the construction project to line Stern's own pockets; (iii) misappropriated funds in connection with the construction and development of the Property for Stern's benefit and at the expense of the other Project investors; and (iv) improperly withheld books and records.  (*See* Flanders Decl., Ex. D.)  The Tona Action Plaintiffs named the Debtor and various of its Project subsidiaries, as well as Stern personally, as defendants (the "Tona Action Defendants").  *Id.*

24.     Stern retained Kasowitz Benson Torres LLP ("Kasowitz") to jointly represent the Debtor, Stern personally, and various other defendants accused of damaging the Debtor – a clear conflict of interest.  (Flanders Decl. ¶ 8.)  Despite Largo's objections, and Kasowitz's failure to procure any conflict waivers (which would have required Largo's consent), Kasowitz continued its joint representation in the Tona Action and other matters adverse to Largo.  *Id.* at ¶ 10.  Kasowitz

racked up millions of dollars in largely unsuccessful dismissal motion practice, reargument, appeal, and discovery stonewalling aimed almost exclusively at immunizing Stern from liability at the expense of the Project and ultimately the Debtor. (Tona Action October 18, 2019 Decision + Order on Motion, D.I. 117; *Baltic Fourth LLC, et al. v. Stern et al.*, Case No. 2019-04889 (1st Dep't April 29, 2021), D.I. 19; July 1, 2021 Status Conference Order, Flanders Decl. Exs. E, F, and G.)

25.    As Justice Ostrager later recognized on summary judgment in the Tona Action, Stern paid Kasowitz millions of dollars using Project funds to protect himself, and his own entities, which was not authorized under the Project operating agreements. (Tona Action April 9, 2021 Decision & Order on Motions 009 and 010, D.I. 491, Flanders Decl., Ex. H.)  Again, Kasowitz sought summary judgment dismissing claims against Stern personally, including alter ego claims, which Justice Ostrager denied. *Id.* at 16.

26.    Following Justice Ostrager's order on the Tona Action parties' respective motions for summary judgment, the Tona Action trial was scheduled to commence on June 2, 2021. *Id.* at ¶ 17.

### 2.    The Maxx Action

27.    Upon learning of Largo's intent to file its own complaint against Stern and his affiliates, Stern immediately raced to the courthouse to file a series of specious lawsuits against Largo and its affiliates – which action may have been funded through Project funds. (Flanders Decl. ¶ 19.)  One such action involved claims related to the Project styled *JDS Fourth Avenue JV II LLC, JDS Construction Group LLC, and JDS Fourth Avenue Developer LLC v. Largo 613 Baltic Street Partners LLC, and Maxx LLC*, Index No. 651948/2020 (the "Maxx Action").[2]  (Flanders

---

[2] Another case filed the same day by Kasowitz on behalf of Stern affiliates styled: *JDS Highline LLC, on behalf of itself and derivatively on behalf of JDS-Largo 514 West 24th Street v. 514 West*

Decl. ¶ 20.)

28.     Upon information and belief, Stern also used Project funds to finance these claims

again using Kasowitz, the Debtor's counsel, *i.e.*, using Project funds to pay for a lawsuit brought

by one Debtor member asserting claims against another Debtor member with a conflicted law firm.

Motions to dismiss and for disqualification of counsel in the Maxx Action are *sub judice*. *Id.* at

¶ 21.

### 3.    <u>The Baltic Action</u>

29.     After Justice Ostrager denied a motion to intervene in the Tona Action directing

that such claims should be commenced through a separate case, Largo commenced a separate

action in New York Supreme Court for the Project-related disputes styled *Largo 613 Baltic Street*

*Partners LLC, directly and derivatively on behalf of JDS Fourth Avenue LLC, Fourth Avenue JV*

*LLC, Fourth Avenue Mezz LLC, and Fourth Avenue Property Owner, LLC v. Michael Stern, JDS*

*Fourth Avenue JV II LLC, JDS Construction Group LLC, JDS Fourth Avenue Developer LLC, and*

*John Does 1-5*, Index No. 652986/2020 (the "<u>Baltic Action</u>").  (Flanders Decl. ¶ 23.)  The Baltic

Action was marked as a "related case" to the Tona Action and also assigned to Justice Ostrager.

*Id.* at ¶ 24.

30.     In sum, the Baltic Action asserts claims, including on behalf of the Debtor, against

Stern, Stern Holdings, JDS Construction, and JDS Developer (together, the "<u>Baltic Action</u>

<u>Defendants</u>") for fraud, breaches of fiduciary duty, and mismanagement and diversion of assets,

among other claims, related to the Project.  (*See generally* Baltic Action Complaint, Flanders Decl.,

Ex. J.)

---

*24th Street Partners LLC, et al.*, Index No. 651976/2020 (the "<u>Fitzroy Action</u>") with similar claims
to the Maxx Action but dealing with an unrelated project was thrown out in all material respects
on dismissal.  (Fitzroy Action Decision + Order on Motion, D.I. 29, Flanders Decl. Ex. I.)

31.     The Baltic Action Defendants, apparently utilizing the same playbook that Kasowitz and Stern had in the Tona Action, engaged in substantial discovery stonewalling in the Baltic Action triggering a series of New York Supreme Court admonitions and a directive by Justice Ostrager for Largo to file a sanctions motion.  (February 19, 2021 Order; March 16, 2021 Order; May 5, 2021 Order; Flanders Decl., Exs. K, L, and M.)  For example, on February 19, 2021, Justice Ostrager issued an Order providing:

> [D]efendant has failed to comply with document discovery … **If the defendant does not substantially comply with plaintiff's outstanding document requests and interrogatories, plaintiff will be granted leave to file a motion to strike the defendant's answer**.  As stated during the conference call, the Court has had prior experience with the defendants' non-compliance with discovery orders in another case and the parties can depend upon judicial enforcement of this order.

*Id.* at Ex. K (emphasis added).)

32.     On May 3, 2021, faced with the possibility of discovery sanctions, the Baltic Action Defendants abruptly substituted counsel.  *Id.* at ¶ 30.  Newly retained counsel, Lewis Brisbois Bisgaard & Smith LLP ("Lewis Brisbois"), informed Largo's counsel that they were going to require time to get up to speed and understand the pending discovery issues.  *Id.*  During a status call on May 5, 2021, however, Justice Ostrager adamantly refused to further extend discovery, emphasizing that discovery would be closing on June 30, 2021.  *Id.*  More importantly, Justice Ostrager instructed Largo's counsel to promptly file a motion if discovery issues were still outstanding.  *Id.*

33.     As a result, on May 28, 2021 — in advance of a scheduled June 1, 2021 status conference with the New York Supreme Court and in accordance with Justice Ostrager's instructions — Largo filed an Order to Show Cause for Discovery Related Relief requesting, among other relief, that the Court strike the Baltic Action Defendants' answer.  *Id.* at ¶ 31.

**E.    Without Authority, Stern Causes This Bankruptcy Case**
**To Be Filed to Evade Imminent Exposure for Himself and His Affiliates**

34.    On June 1, 2021 — one business day after Largo filed its sanctions motion in the Baltic Action, just minutes before a discovery conference in the Baltic Action, and ***less than 24 hours*** before trial was to commence in the Tona Action — Baltic Action Defendants filed a Notice of Removal in the Baltic Action.  (Flanders Decl. ¶ 32.)  Apparently (albeit without any warning to the Debtor's own 49% member, Largo), that same day, the Debtor had filed for chapter 11 relief in this Court. *Id.* at ¶ 33.

35.    Importantly, however, Stern (acting through Stern Holdings or otherwise) lacked the authority to unilaterally cause the Debtor to file for bankruptcy, and Largo never authorized the Debtor to file for bankruptcy.  (Werner Decl. ¶ 15.)  Moreover, neither Stern nor any other party made any attempt to contact Largo to request authorization for the bankruptcy filing or to provide advance notice of the same.  *Id.* at ¶ 14.  The Resolutions of the Managing Member of JDS Fourth Avenue LLC that were attached to the chapter 11 petition confirm that the Managing Member did not even bother to consult Largo on this important decision.  (D.I. 1, Flanders Decl., Ex. A.)  Rather, in conclusory fashion, the Resolutions state that the Managing Member conveniently decided Largo was too conflicted to approve the bankruptcy filing.

> WHEREAS, the Managing Member of the Company has determined, with the advice of counsel, that the other member of the Company, Largo 613 Baltic Street Partners LLC, is conflicted and will not provide consent to the Company's decision to seek bankruptcy protection because of such conflict; and …

*Id.*

36.    Minutes after filing a Notice of Removal in the Baltic Action (and less than 24 hours before the commencement of trial in the Tona Action), the Tona Action Defendants also filed a Notice of Removal in the Tona Action.  (Tona Action Notice of Filing of Notice of Removal,

Flanders Decl. Ex. N.)  Conveniently, however, although the claims in the Maxx Action also arise

out of the same Project and involve many related entities and facts, no attempt was made to remove

that action.  (Flanders Decl. ¶ 35.)

37.     As reflected in the scant initial filings in the JDS Fourth Bankruptcy Case, the

Debtor has no secured creditors.  The Debtor's list of creditors holding the 20 largest non-insider

unsecured claims identifies a total of eight unsecured creditors, with aggregate liquidated claims

amounting to a little more than $500,000.  Other than Largo and the two plaintiffs in the Tona

Action, the Debtor identified five unsecured creditors, three of which are law firms (Kasowitz,

Lewis Brisbois and Lydecker).  The other two creditors consist of a financial consultant (FTI

Consultants) and the American Arbitration Association.  (Flanders Decl. Ex. A.)  These creditors

appear to be arbitrarily listed as debts of the Debtor, rather than of the various other defendants

(Stern and his affiliates) that shared in these services.

38.     The Debtor did not file any "first day" motions, underscoring its lack of any

business operations, employees, or cash flow.  (Docket of chapter 11 case as of June 10, 2021,

Flanders Decl. Ex. C.)  There is no budget for this chapter 11 case.  *Id.* at ¶ 5.

39.     In the *Declaration of Michael Stern in Support of Bankruptcy Petition* (the "Stern

Declaration"), filed days after the Petition Date presumably to try to justify the stand-alone chapter

11 petition, the Debtor concedes it filed its chapter 11 case to impede the state lawsuits: "[R]ecent

developments in the last few weeks in New York state courts have essentially rendered impossible

effective litigation of ongoing actions and other actions and claims arising from the Property

(defined below) at the center of this matter … ."  (D.I. 4 at ¶ 3, Flanders Decl. Ex. C.)

13

**BASIS FOR RELIEF REQUESTED**

**Point I**

**THE COURT LACKS SUBJECT MATTER
JURISDICTION OVER THE UNAUTHORIZED PETITION**

40.     A bankruptcy court "lacks subject matter jurisdiction over a bankruptcy petition filed without the required corporate authority." *In re Mid-South Business Associates, LLC*, 555 B.R. 565, 570 (Bankr. N.D. Miss 2016) (citing *In re Delta Starr Broadcasting, L.L.C.*, 422 F. App'x 362, 368 (5th Cir. 2011)); *In re FKF Madison Park Grp. Owner, LLC*, No. 10-11867 KG, 2011 WL 350306, at *3 (Bankr. D. Del. Jan. 31, 2011) ("A party cannot subject an entity to bankruptcy without authority")

41.     Any suit lacking subject matter jurisdiction "must be dismissed regardless of how long a case has been pending." *Temple Drilling Co. v. La. Ins. Guar. Ass'n.*, 946 F.2d 390 (5th Cir. 1991)); *see also Price v. Gurney*, 324 U.S. 100, 106 (1945) (holding that if trial court "finds that those who purported to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition"); *In re S & R Grandview, LLC*, No. 13-03098-8-RDD, 2013 WL 5525729, at *4 (Bankr. E.D.N.C. Oct. 4, 2013) (dismissing Chapter 11 petition where debtor limited liability company did not obtain approval of majority interest of members pursuant to the terms of the operating agreement); *In re NNN 123 N. Wacker, LLC*, 510 B.R. 854, 858-59 (Bankr. N.D. Ill. 2014) (dismissing bankruptcy case under Delaware law where the filing of bankruptcy required unanimous consent of its members, unanimous consent was not obtained, and therefore there existed no authority to file).

14

## A.    Corporate Authority to File Bankruptcy is Governed by State Law.

42.    In the context of a corporation, the United States Supreme Court has held that authority to file a bankruptcy petition is determined under state law. *Price v. Gurney*, 324 U.S. 100 (1945) (finding that, absent federal incorporation, authority to file bankruptcy petition for corporation determined by local law, and petition filed without such authority should be dismissed). Bankruptcy courts have extended the *Price v. Gurney* ruling to LLCs in reported decisions directly focusing on the authority of persons acting for a LLC to cause the LLC to file a bankruptcy petition. *See In re Avalon Hotel Partners, LLC*, 302 B.R. 377 (Bankr. D. Or. 2003) (applying Oregon state law to determine Oregon LLC authority to file bankruptcy petition); *In re Real Homes, LLC*, 352 B.R. 221 (Bankr. D. Idaho 2005) (considering Idaho state law and LLC organizational documents to determine whether bankruptcy filing by Idaho LLC was authorized); *In re A-Z Elecs., LLC*, 350 B.R. 886 (Bankr. D. Idaho 2006) (holding that Idaho state law, not bankruptcy law, determines whether an Idaho LLC's bankruptcy filing was authorized). A similar ruling was made by a Louisiana Bankruptcy Court in an unreported decision. *In re Delta Starr Broad., LLC*, No. Civ A. 05-2783, 2006 WL 285974 (E.D. La. Feb. 6, 2006) (stating that "to determine whether a voluntary bankruptcy petition filed on behalf of a business entity was filed with the proper authority, the court looks to the law of the entity's state of organization").

43.    As stated by the Fifth Circuit, "without further direction from Congress, we will continue to look to state law to determine which people have authority to seek federal bankruptcy protection on behalf of state-created business entities." *In re Phillips*, 966 F.2d 926, 934 (5th Cir. 1992); *see also In re Wyatt & McAlister, PLLC*, 2010 WL 1709920, at *3 (Bankr. S.D. Miss. Apr. 23, 2010); *In re TAGT, L.P.*, 393 B.R. 143, 148 (Bankr. S.D. Tex. 2006) (holding that authority to file bankruptcy petitions "must be determined from the state law governance documents of those

entities"); *In re Marino*, 2010 WL 519772, at *3 (Bankr. S.D. Tex. Feb. 9, 2010) (holding that "authority to file a bankruptcy petition on behalf of a corporation must derive from state corporate governance law, and the corporate by-laws").

44.     The Debtor is a limited liability company organized and existing under the laws of the State of Delaware.  (LLCA p. 1, Werner Decl. Ex. D.)  Under Delaware law, "a limited liability company is governed by the operating agreement, which defines the rights of members."  *In re FKF Madison Park Grp. Owner, LLC*, 2011 WL 350306, at *3.  "[L]imited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members."  *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009).  Thus, the rights of limited liability company members are contractual in nature.  *See In re FKF Madison Park Grp. Owner, LLC*, 2011 WL 350306, at *3.

45.     Because the rights of limited liability company members are contract rights, "a court applies the same principles that are used when construing and interpreting other contracts." *Godden v. Franco*, No. CV 2018-0504-VCL, 2018 WL 3998431, at *8 (Del. Ch. Aug. 21, 2018); *see also Alta Berkley VI C.V. vs. Omneon, Inc*. 2011 WL 2923884, at *4 (Del. Super. Ct. July 21, 2011) (holding that "it is well settled that canons of contract construction must be applied when construing the rights of preferred stockholders as provided in the certificate").  Under Delaware law, such contract construction principles mandate that the court "give priority to the parties' intentions as reflected in the four corners of the agreement construing the agreement as a whole and giving effect to all its provisions." *Godden*, 2018 WL 3998431, at *8.

46.     A Delaware court's primary goal in matters of contract interpretation "is to effectuate the parties' intent" *Id.*  In attempting to discern the intent of the parties, the court initially

must confine its review to the "four corners of the agreement" and the contract's "construction should be that which would be understood by an objective, reasonable third party." *Id.* Unambiguous contracts are enforced as written. *Id.*; *see also Sanders v. Devine*, No. Civ. A. 14679, 1997 WL 599539, at *5 (Del. Ch. Sept. 24, 1997) (enforcing "clear and unambiguous" preferred stock rights as to cash-out merger, holding that plaintiff was "precluded from suing the defendants for acting in conformity with the terms of an agreement which he freely entered into, and which concededly, governs his rights"). A court can only "resort to extrinsic evidence to determine the parties' intentions" if the language is ambiguous, i.e., not "fairly or reasonably susceptible to only one interpretation." *BLGH Holdings LLC v. enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012).

47.     Moreover, "[w]hen parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract." *James v. Nat'l Fin., LLC*, 132 A.3d 799, 812 (Del. Ch. 2016) (quoting *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005)); *see also In re Appraisal of Metromedia Int'l Grp., Inc.*, 971 A.2d 893, 900 (Del. Ch. 2009) (preferred stock valuation case with uncontested assertion that, under relevant Certificate of Incorporation, "a bankruptcy petition would not have required a vote by its common shareholders, but it would have to be approved by the preferred holders").

48.     As explained below, the relevant language of the LLCA is unambiguous and clearly bars this Debtor from filing a bankruptcy petition without Largo's consent. And as explained in Section I.B. below, this provision is fully enforceable under federal law.

**A.    Under the Plain Unambiguous Language of the LLCA,
Largo's Approval is A Necessary Condition Precedent
to the Debtor Commencing a Bankruptcy Case.**

49.    Under Delaware law, limited liability company agreement – here the LLCA for the

Debtor – is the organizational document that governs the rights of the limited liability company

members.  *See Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009) ("limited

liability companies are creatures of contract, and the parties have broad discretion to use an LLC

agreement to define the character of the company and the rights and obligations of its members");

*In re FKF Madison Park Grp. Owner, LLC*, 2011 WL 350306, at *3.

50.    Here, the Debtor's LLCA mandates that Largo's consent is an absolute condition

of filing a bankruptcy petition on behalf of JDS Fourth.  (LLCA § 8.3, Werner Decl. Ex. D [barring

"Commencement by the Company of any Bankruptcy Action in respect of the Company …

without the prior unanimous written consent of Largo"].)

51.    These restrictions are so fundamental that Stern Holdings agreed to indemnify

Largo, its affiliates, and the Debtor itself for violating this provision.  *Id.* at § 7.9(b)

(indemnification specifically arising out of "voluntary or involuntary bankruptcy" as well as other

LLCA breaches).  Indeed, Stern, *inter alia*, agreed to personally guarantee such bankruptcy related

indemnification obligations.  *Id.*

52.    The language of LLCA § 8.3 is clear and unambiguous and thus, under controlling

Delaware law, should be enforced as written.  *Alta Berkley VI C.V.*, 2011 WL 2923884, at *4

(courts to enforce plain meaning of terms); *Sanders,* 1997 WL 599539, at *5 (enforcing "clear and

unambiguous" terms enforced as written).  Largo has not consented to the Debtor's filing of its

chapter 11 petition, and therefore under the plain mandates of the LLCA a necessary condition

precedent to the filing has not been satisfied.  (Werner Decl. ¶ 15.)  *In re Orchard at Hansen Park*

*LLC,* 347 B.R. 822 (Bankr. N.D. Tex. 2006) (dismissing petition because bankruptcy filing was

not authorized with the unanimous consent of all members and managers, including independent

manager, as required by LLC's operating agreement).

**B.      Federal Public Policy Does Not Invalidate Largo's Retention
of its Right to Control Bankruptcy Filings.**

53.      Courts have confirmed that equity owners have the right to retain for themselves

control over whether an entity they own may file a bankruptcy petition.  For example, *In re Squire*

*Partners Limited Partnership*, 2017 WL 2901334, at *4-5 (E.D. Ark. July 7, 2017), involved a

debtor formed as a limited partnership organized under Arkansas law.  *Id.* at *1.  The debtor

partnership's governing document required unanimous consent of the partners before the entity

could file a bankruptcy petition.  *Id.*  As here, a bankruptcy petition was filed on behalf of the

partnership without the unanimous consent of the partners in violation of the partnership agreement

consent requirement.  *Id.* at *2.

54.      On appeal, the Arkansas District Court affirmed the bankruptcy court's dismissal

of the bankruptcy case for lack of subject matter jurisdiction because the filing was not properly

authorized.  *Id.* at *5.  In reaching this decision, the Arkansas District Court focused on the critical

distinction between equity holders that reserve control over bankruptcy filings by entities they own

and creditor-imposed bankruptcy prohibitions that are invalid as a matter of federal public policy.

*Id.* at *3-5.  The court noted that, in contrast to the creditor-imposed blocking provisions that are

routinely invalidated on public policy grounds, the objecting parties "***are owners, not creditors*** of

[the debtor entity]."  *Id*. at *4 (emphasis added).  The court affirmed dismissal of the bankruptcy

because the debtor's equity owners had "retained for themselves, acting by unanimous consent,

the decision whether to file a bankruptcy petition."  *Id.* The court held:

> It is one thing to look past corporate governance documents and the structure of a corporation when a ***creditor** has negotiated* authority to veto a debtor's decision to file a bankruptcy petition; it is quite another to ignore those documents when the ***owners** retain for themselves* the decision whether to file bankruptcy.  It is one thing for courts to overrule a creditor that seeks to block a debtor from filing bankruptcy; it is quite another for the courts to overrule the owners of the entity.

*Id.* at *5 (emphasis added).

55.     Similarly, in *In re Global Ship Sys., LLC*, 391 B.R. 193 (Bankr. S.D. Ga. 2007), the bankruptcy court recognized an equity holder's "unquestioned right to prevent, by withholding consent, a voluntary bankruptcy case," where the debtor entity's organizational documents afforded the equity owner such control. *Id.* at 203.  The court acknowledged the cases holding that an "absolute waiver of the right to file bankruptcy is violative of public policy ***if asserted by a lender***" but found those cases inapplicable because the non-consenting equity holder "***wears two hats in this case***," in that it "***holds both debt and equity positions***."  *Id.* at 203 (emphasis added). The court further observed that, as an equity holder, the non-consenting owner "was granted certain protections in the governance of the [debtor entity, which] . . . could not sell substantially all of its assets, merge with another company, or file a voluntary bankruptcy case without the consent of [equity holder]." *Id*.

56.     Analyzing the applicable state law, the bankruptcy court concluded that the debtor's organizational document was "very clear" that "[a]ny decision to file a voluntary bankruptcy required the consent of [the objecting party] as a Class B equity member." *Id*. at 204.  The court concluded that the objecting party (wearing its "Equity Hat") "retained a separate right, as an equity holder, to refuse to consent to the filing of a voluntary bankruptcy case," and found that his refusal to consent mandated dismissal of the bankruptcy petition.  *Id.* at 203-04; *see also In re DB Cap. Holdings, LLC*, 463 B.R. 142 (10th Cir. BAP (Colo.) 2010) (affirming bankruptcy court's dismissal of case where debtor entity's petition was not authorized by all equity owners (as

20

mandated by entity's organizational documents) and noting that neither the court nor the parties

had located any authority standing for the proposition that agreement among equity holders to

restrict an entity's ability to seek bankruptcy protection was void as against federal public policy);

*In re Franchise Servs. of N. Am., Inc.*, No. 1702316EE, 2018 WL 485959 (Bankr. S.D. Miss. Jan.

17, 2018), *aff'd*, 891 F.3d 198 (5th Cir. 2018), *as revised* (June 14, 2018).

57.     The facts supporting this conclusion are even stronger in this case than in *Global

Ship Systems*.  Largo is not a lender to the Debtor; but rather, it is the 49% member of the Debtor.

Its unsecured creditor status arises out of its position as an equity holder.   Thus, Largo

unquestionably has the right to control whether the Debtor seeks bankruptcy relief.

58.     It is undisputed that (1) Largo is an owner of the Debtor, (2) Largo has the right

under the LLCA to control whether the Debtor files a bankruptcy petition, and (3) Largo has not

consented to the filing of the Debtor's chapter 11 petition.  (Werner Decl. ¶¶ 5, 15.)

59.     The Debtor's resolutions in support of its chapter 11 filing include a misguided

attempt – without any legal basis – to justify the Debtor's failure to obtain the requisite corporate

authority.   The Debtor claims that Largo is "conflicted" and therefore will not consent to a

bankruptcy filing.   One can only speculate that the Debtor is trying to impose the standard for

obtaining derivative standing when a shareholder fails to make a demand on a corporation before

filing a lawsuit.   The law does not recognize any 'demand futility' equivalent for bankruptcy

authority.  LLCs act only through authorized decision makers and Stern Holdings simply had no

such authority to act with respect to this bankruptcy filing.  Ironically, the bogus resolution leaves

unexplained how Largo somehow is absolutely 'conflicted' in considering a bankruptcy filing

decision, while Stern Holdings – controlled by Stern who personally is seeking to immunize

himself and his affiliates from pending trial and sanctions liability through this filing – is somehow

free from conflict.

60. The LLCA gives Largo the unfettered right to prevent a bankruptcy filing and there is no substitute for failing to obtain the prior unanimous written consent of Largo to a bankruptcy. Because the petition was filed without Largo's consent, it must be dismissed.

**Point II**

**EVEN IF THE FILING WAS PROPERLY AUTHORIZED (WHICH IT WAS NOT), THE CASE SHOULD BE DISMISSED FOR "CAUSE" PURSUANT TO SECTION 1112(B) OF THE BANKRUPTCY CODE**

61. Section 1112(b) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing, the Court shall ... dismiss a case under this chapter ... *if the movant establishes cause*" where dismissal "*is in the best interests of creditors and the estate.*" U.S.C. § 1112(b)(l) (emphasis added).

62. Courts have interpreted "cause" under 1112(b) to impose a requirement that all bankruptcy cases be filed in good faith. *See In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999) ("a Chapter 11 petition is subject to dismissal for "cause" under 11 U.S.C. § 1112(b) unless it is filed in good faith"). Dismissal is also required for "cause" where there is a risk of continuing loss and/or the Debtor cannot reasonably hope to confirm a plan. 11 U.S.C. § 1112(b)(4)(A)-(B).

63. A request for dismissal under § 1112(b) must be scheduled by the Court no later than 30 days after filing of the motion, and must be decided by the Court no later than 15 days after commencement of the hearing, unless the movant expressly consents to a continuance for a specific period of time or "compelling circumstances" prevent the Court from meeting the time limits. 11 U.S.C. § 1112(b)(3).

22

### A.    The Petition was Filed in Bad Faith.

64.    "Good faith is a predicate to the right to file a petition in bankruptcy…." *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 297 (Bankr. D. Del. 2011).  "Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish [good faith]." *In re 15375 Memorial Corp.*, 589 F.3d 605, 618 (3d Cir. 2009) (quotations omitted) (alterations in original).

65.    The Third Circuit has adopted a fact-intensive, "totality of facts and circumstances" test to determine good faith. *In re SGL Carbon Corp.*, 200 F.3d at 165-66. The "good faith" inquiry is "based more on an objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of chapter 11 than the subjective intent of the debtor." *15375 Memorial*, 589 F.3d at 618 n.8.

66.    The Third Circuit has identified two essential elements for a "good faith" bankruptcy filing.  **First**, the bankruptcy petition must "serve[] a valid bankruptcy purpose." *See id.* at 618; *SGL Carbon*, 200 F.3d at 165.  **Second**, the bankruptcy cannot be filed "merely to obtain tactical litigation advantage." *15375 Memorial*, 589 F.3d at 618; *In re JER/Jameson*, 461 B.R. at 298-99 (*citing In re Primestone Inv. Partners, L.P.*, 272 B.R. 554, 557 (D. Del. 2002)).

### 1.    The Debtor's Case Serves No Valid Bankruptcy Purpose.

67.    The essential valid purposes of chapter 11 are (i) "preserving going concerns," and (ii) "maximizing property available to satisfy creditors." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004).  Here, the Debtor is not a regular ongoing concern with continuous operations.  As is evident by the absence of any first day motion and a case budget, the Debtor has all but admitted that it is not an operating business.  Other than its interests in another limited liability company that has interests in a different limited liability company that owns the Property, the Debtor is not a "going concern." *See 15375 Memorial*, 589 F.3d at 619

(acknowledging there was no "going concern" where debtor had "no employees, offices or business other than the handling of litigation").

68.     These equitable limitations on the chapter 11 process are necessary to ensure that the hardship on particular creditors resulting from the exercise of the debtor's considerable bankruptcy powers (the automatic stay, the exclusive right to propose a plan, the discharge of debts, etc.) are justified.  *SGL Carbon*, 200 F.3d at 165-66; *see Integrated Telecom*, 384 F.3d at 120 n.4 ("The good faith requirement is necessitated as much by the hardship of Chapter 11 to certain interests as it is by the benefit to others.").

69.     The factors articulated in *Primestone* and its progeny which tend to show an invalid purpose are: (i) whether it is a single asset case, (ii) if there are few or no unsecured creditors, (iii) if the Debtor is an ongoing business or employees, (iv) if a petition is filed on eve of foreclosure or other state court action, (v) if the claims involve a two-party dispute which can be resolved in pending state court action, (vi) if the Debtor has no cash or income, (vii) no pressure from non-moving creditors, (viii) no possibility of reorganization, and (ix) filing solely to invoke the automatic stay.  *See Primestone*, 272 B.R. at 557 (noting factors).  All of these factors are met when applied to this chapter 11 case.

70.     Here, the *Primestone* factors weigh heavily in favor of dismissal: (i) the Debtor is a single purpose holding entity with a single asset (a membership interest in a subsidiary), (ii) there are very few unsecured creditors, most of which are law firms, (iii) there is no ongoing business and no employees because the Debtor just holds membership interests in a subsidiary that has a subsidiary that owns the Project, which is substantially finished and sold off to condo unit owners, (iv) the petition was filed minutes before a discovery conference (following the filing of a sanctions motion) in the Baltic Action and one day prior to trial in the Tona Action, (v) this is effectively a

24

two-party dispute which can be, and was being, resolved in the pending New York state court actions, (vi) there is little cash or income, (vii) there is no pressure from non-moving creditors (both Kasowitz and Lewis Brisbois are actively representing the Debtor in the state court litigations), (viii) there is no possibility of reorganization given there are not operations or hard assets (other than membership interests in the subsidiary) with which to reorganize, and (ix) the filing was intended to invoke the automatic stay. *See Primestone*, 272 B.R. at 557 (noting factors and dismissing bankruptcy petition filed on eve of foreclosure for lack of good faith).

71.    Nor can the Debtor show that a bankruptcy will maximize value.  The sole principal of the Debtor's current Managing Member already misused millions of dollars for his personal benefit and has continued to waste the Project investors' cash by commencing this chapter 11 case – even going so far as to list the debt of other entities Stern controls as debt of the Debtor.  As noted above, Stern's self-dealing includes using the Debtor's cash to fund Stern's personal legal expenses. (Tona Action April 9, 2021 Decision & Order on Motions 009 and 010, D.I. 491 [noting that "the Court was – as is – inclined to find Plaintiff's argument that" the Debtor's cash was improperly used to fund legal fees, but there was an issue of fact as "to the actual amount of legal fees that were paid with Project funds on behalf of which Defendants those fees were paid" because "[i]t came to light at oral argument that this number is disputed, and presumably, growing"], Flanders Decl., Ex. H.)  The Debtor's chapter 11 petition acknowledges that there will be no funds available for the distribution to the Debtor's unsecured creditors after the administrative costs of this chapter 11 case are paid.  (D.I. 1 ¶13, Flanders Decl., Ex. A.)  Largo questions whether the Debtor can even cover the administrative expenses that have already been incurred by the Debtor let alone the additional administrative expenses that would accrue during the continued pendency of this chapter 11 case. *Id.*

72.    Stern has failed to look out for the Debtor's creditors at every turn and cannot be trusted to continue to manage the Debtor or propose a legitimate plan.  It is unclear what a chapter 11 plan would even look like for a single purpose holding company with nothing but membership interests in another holding company that has a subsidiary that owns a condominium development where all the condos have already been sold.  (Werner Decl. ¶ 16.)  The chapter 11 process here cannot result in an outcome that cannot already be obtained through the pending state court actions.

73.    Although the underlying state court litigations nominally include several entities, this is effectively a two-party dispute between Stern (and entities he controls) and the Project's investors.  The filing, which took place mere minutes before a conference on Largo's request for discovery-related sanctions in the Baltic Action and less than 24 hours before the commencement of trial in the Tona Action, serves only one purpose: obtaining an automatic stay to halt the creditors' litigation against Stern and his affiliates.  (*See* Stern Affidavit, at ¶ 3, Flanders Decl., Ex. C.) The desire to obtain the protections of the automatic stay is not a valid justification for seeking bankruptcy relief.  *See 15375 Memorial*, 589 F.3d at 620; *Integrated Telecom*, 384 F.3d at 128.

74.    In dismissing the debtor's bankruptcy case, the *Primestone* bankruptcy court found that the debtor was sufficiently protected by its bargained-for contractual rights under state law, and that it would be inappropriate to arm the debtor with the powers of chapter 11 to disadvantage its sole secured creditor.  *Primestone*, 272 B.R. at 558.  The district court affirmed. *Id.*

75.    Similarly, in *JER/Jameson*, Judge Walrath dismissed the debtor's bankruptcy petition for cause and with prejudice, finding that it too had been filed on the eve of foreclosure as a litigation tactic and did not serve a valid reorganization purpose because there was no evidence that the bankruptcy process would "realize some value that would not be available outside of state

court."  461 B.R. at 303; *see also In re Stone Fox Capital LLC*, 572 B.R. 582, 589 (Bankr. D. Del.

2017) (applying *Primestone* factors to dismiss bankruptcy petition for cause and with prejudice).

76.      If anything, the case for dismissal here is even more compelling than in *Primestone*,

*JER/Jameson*, and *Stone Fox*.  The Debtor does not have any employees, operations, or directly

owned property aside from membership interests in another holding company, nor does it have an

income stream or a budget for the bankruptcy case.  It has less than ten creditors, all of which are

litigation-related.  There is no real financial distress here.  *In re Rent-A-Wreck of Am., Inc.*, 580

B.R. 364, 372 (Bankr. D. Del. 2018) (Judge Silverstein dismissed jointly-administered chapter 11

cases after finding, *inter alia*, that the companies were not in financial distress).  The Debtor's

attempt to have this Court believe that litigation fees and costs drove it into bankruptcy is

disingenuous.  Stern has taken the position that the Debtor has had no assets for years.  (Werner

Decl. ¶ 17.)  Unauthorized litigation fees were paid, not from the Debtor, but from its subsidiaries

using Project funds at the subsidiary level.  (Tona Action April 9, 2021 Decision & Order on

Motions 009 and 010, D.I. 491 [noting that "the Court was – as is – inclined to find Plaintiff's

argument that" Debtor's cash was improperly used to fund legal fees, there was an issue of fact as

"to the actual amount of legal fees that were paid with Project funds on behalf of which Defendants

those fees were paid" because "[i]t came to light at oral argument that this number is disputed, and

presumably, growing"], Flanders Decl., Ex. H.)

## 2.      The Debtor's Case was Filed Solely to Obtain a Litigation Advantage.

77.      The filing smacks of forum shopping.  After preparing for a trial three years in the

making throughout the Memorial Day weekend, Stern did not like his chances in New York

Supreme Court and so filed this bankruptcy case Tuesday morning on the eve of trial, to see if he

can get a different result here.  (*See* Stern Affidavit, at ¶ 3, Flanders Decl., Ex. C.)

78.      A chapter 11 case is subject to dismissal if it was commenced primarily to obtain a

tactical litigation advantage. *15375 Memorial*, 589 F.3d at 605; *SGL Carbon*, 200 F.3d at 165. Here, that plainly appears to be the sole purpose. The Debtor filed its bankruptcy petition minutes before a discovery sanctions conference in the Baltic Action and on the eve of trial in the Tona Action. It was a naked petition that included no typical "first day" motions. The bankruptcy filing's only purpose was to prevent, through the application of the automatic stay, Justice Ostrager from ruling on the discovery sanctions request and presiding over trial in the Tona Action. Obviously, the filing of the Debtor's chapter 11 petition was a thinly veiled, manufactured attempt to gain a tactical advantage over Largo and the Tona Action Plaintiffs.

79.     Chief Judge Sontchi recently dismissed a chapter 11 case with much less egregious facts because the chapter 11 case was filed, in essence, to address a two-party dispute. *In re GVS Portfolio I B, LLC*, No. 21-10690 (CSS), 2021 WL 2285285 (Bankr. D. Del. June 4, 2021) (dismissing a two-party dispute chapter 11 case even though there was no finding of bad faith).

80.     Here, the Debtor does not and cannot meet its burden of proving that this bankruptcy case was filed in good faith. Perhaps even more importantly, this is a quintessential two-party dispute between Stern and the Project investors and there are two associated lawsuits pending where liability and damages will be decided soon. Accordingly, the chapter 11 case should be dismissed. *Id.*

### B.     There is a Substantial Risk of Continuing Loss; and the Debtor Cannot Effectuate a Plan.

81.     Under Bankruptcy Code section 1112(b)(4), "substantial and continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" constitutes "cause" for dismissal. 11 U.S.C. § 1112(b)(4)(A)-(B). Here, there is no "going concern" to preserve, only litigation to defend against and no remaining assets to distribute to creditors. (D.I. 1, Flanders Decl., Ex. A.) There is also a serious risk of further loss due to ongoing

mismanagement, legal fees spending, and chapter 11 administrative expenses. *See In re Stone Fox*, 572 B. R. at 591 (noting ongoing administrative expenses as basis for dismissal).

82. In the chapter 11 case at hand, even if the petition had been filed in good faith, the case should still be dismissed for cause under Bankruptcy Code section 1112(b)(4). The Debtor's inability to effectuate a chapter 11 plan alone constitutes "cause" for dismissal. *In re 3 RAM, Inc.*, 343 B.R. 113, 117 n.14 (Bankr. E.D. Pa. 2006) (the inability to effectuate a chapter 11 plan constitutes independent "cause" for dismissal). There is no "reasonable likelihood" of reorganization for a business that has only indirect ownership of a completed Project with no income stream. Moreover, Largo and the Tona Action Plaintiffs – representing the Debtor's creditors that are not law firms, financial consultants or arbitrators – have pending lawsuits that are well on their way to adjudication. With no clear source of cash to administer this bankruptcy case and definitely no funds to distribute to its creditors, there is no reasonable likelihood that the Debtor can effectuate a plan.

### Point III

### IN THE ALTERNATIVE, THE COURT SHOULD ABSTAIN FROM HEARING THIS CASE

83. Bankruptcy Code section 305(a)(l) empowers bankruptcy courts to dismiss an otherwise proper bankruptcy case at any time if "the interests of creditors and the debtor would be better served by such dismissal." *See* 11 U.S.C. § 305(a)(l). The decision to dismiss a bankruptcy case under section 305(a)(l) is left to the discretion of the bankruptcy judge. *See* 11 U.S.C. § 305(c); *In re Monitor Single Lift L Ltd*., 381 B.R. 455, 463 (Bankr. S.D.N.Y. 2008*)*. Largo bears the burden of proof. *Monitor Single Lift I*, 381 B.R. at 462-63.

84. In considering whether dismissal under section 305(a)(l) is warranted, courts consider a wide range of factors, including the following:

(1) the economy and efficiency of administration;

(2) whether the forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3) whether federal proceedings are necessary to reach a just and equitable

Solution;

(4) whether there is an alternative means of achieving an equitable distribution of assets;

(5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7) the purpose for which bankruptcy jurisdiction has been sought.

See In re Amc Investors, LLC, 406 B.R. 478, 488 (Bankr. D. Del. 2009) (citing In re Paper I Partners, L.P., 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)).

85.    Notably, dismissal under Bankruptcy Code section 305(a)(1) may also be appropriate when the bankruptcy case constitutes a two-party dispute.  "When litigation has been commenced in another forum and that forum is available to determine the parties' interests, dismissal is especially appropriate." Passavant Mem'l Homes v. Laurel Highland Found, Inc. (In re Laurel), 473 B.R. 641, 661 (Bankr. W.D. Pa. 2012) (holding that "factors overwhelmingly favor abstention" where filing took place immediately prior to state court decision on injunctive relief).

86.    Here, the Tona Action Plaintiffs and Largo are the only non-legal services creditors listed on the Debtor's top creditor list.  This is fundamentally a two-party dispute (the Project investors v. Stern) justifying abstention. See, e.g., Argus Group, 206 B.R. at 755-57 (dismissing case that was essentially a two-party partnership dispute under section 305(a)(l)).  In addition, the Tona Action is ready for trial and the Baltic Action is nearly done with discovery.  These associated lawsuits should be permitted to proceed.

87.     The Debtor never would have filed this bankruptcy but for the growing momentum against Stern in the Tona Action and the Baltic Action.  There is no doubt that those plaintiffs and the Debtor itself are better served by allowing those lawsuits to be adjudicated in front of Justice Ostrager who has presided over both cases spanning back three years.  Stern – and his efforts to frustrate creditors, obfuscate, and maintain control – is the only winner in a bankruptcy. Accordingly, the chapter 11 case should be dismissed pursuant to Bankruptcy Code section 305(a)(l).  *See In re Fast Food Properties, Ltd. #1*, 5 B.R. 539, 540 (Bankr. C.D. Cal. 1980) ("It is obvious to me that this Chapter 11 case was filed solely for the purpose of frustrating the enforcement of the power of sale provision under Su-Jae's deed of trust and that the Chapter 11 case should be dismissed.").

88.     For all of the foregoing reasons, the Court should dismiss this chapter 11 case.

## Point IV

### Dismissal Should be with Prejudice

89.     A bankruptcy court may apply its inherent powers under Bankruptcy Code sections 105(a) and 349(a) to dismiss a debtor's chapter 11 case with prejudice and proscribe subsequent filings, where the debtor has commenced its bankruptcy case for an improper purpose and in bad faith.  *See Casse v. Key Bank Nat'l Assoc'n (In re Casse)*, 198 F.3d 327, 336 (2d Cir. 1999); *In re JER/Jameson*, 461 B.R. at 297-99.

90.     Here, the Debtor's flagrant bad faith filing warrants dismissal with prejudice to ensure there is no further interference with the New York Supreme Court proceedings; unless, of course, Largo were to authorize a chapter 11 filing in accordance with the LLCA.

31

## Point V

### Largo Requests Leave to File a Motion Seeking its Attorneys' Fees and Costs Associated with the Instant Bankruptcy Action to the Extent this Court Grants Dismissal Here

91.    The LLCA governing the corporate actions of the Debtor provides: "[i]n the event of any dispute between the parties hereto, the prevailing party shall be entitled to recover from the other party reasonable attorney's fees and costs incurred in connection therewith." (LLCA § 11.11, Werner Decl. Ex. D.)  Furthermore, pursuant to Bankruptcy Rule 9011(c), this Court may grant sanctions, including payment of another party's reasonable attorneys' fees and costs, against those who file bankruptcy petitions with an improper purpose.[3]   Because a sanctions motion must be made separately, *see* Fed. R. Bankr. P. 9011(c)(1)(A), Largo requests leave to file such a motion should this Court grant this Motion to Dismiss.

### CONCLUSION

92.    For the foregoing reasons, Largo respectfully requests that this Court enter an order, in substantially the form attached hereto as Exhibit 3, (i) dismissing the above-captioned chapter 11 case pursuant to Bankruptcy Code sections 1112(b) and/or 305(a), with prejudice and (ii) granting such other relief as may be just and appropriate, including leave for Largo to file a sanctions motion.

---

[3] As Largo is alleging that the Debtor filed the instant bankruptcy action with an improper purpose, Largo's request for leave to seek sanctions was not required to be served upon opposing counsel beforehand. *See* Fed. R. Bankr. P. 9011(c)(1)(A) (noting that the requirement to provide opposing counsel with the twenty-one day opportunity to withdraw the bad faith filing "shall not apply if the conduct alleged is the filing of a petition [with an improper purpose]" (alteration supplied).

Dated: June 10, 2021                      **BLANK ROME LLP**
       Wilmington, Delaware

                                             */s/ Victoria Guilfoyle*
Victoria Guilfoyle (DE No. 5183)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:     (302) 425-6400
Facsimile:     (302) 425-6464
Email:         Guilfoyle@BlankRome.com

-and-

Craig M. Flanders
1271 Avenue of the Americas
New York, NY 10020
Telephone:     (212) 885-5000
Facsimile:     (212) 885-5001
Email:         CFlanders@BlankRome.com

-and-

Jeffrey Rhodes
International Square
1825 Eye Street NW
Washington, DC 20006
Telephone:     (202) 420-2200
Facsimile:     (202) 420-2201
Email:         JRhodes@BlankRome.com

*Counsel to Largo 613 Baltic Street Partners LLC*