Stephen J. Gillespie, Esq.
Christopher J. Sheehy, Esq.
Michael F. McGowan, Esq.
WESTERMANN SHEEHY
SAMAAN & GILLESPIE, LLP
90 Merrick Avenue, Suite 802
East Meadow, New York 11554
516-794-7500

Hearing Date:  TBD
Hearing Time:  TBD
Objections Due:  TBD

Counsel for plaintiffs,
Baltic Fourth LLC and
Tona Construction & Management LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

In re:

JDS FOURTH AVENUE LLC,

                         Debtor.

----------------------------------------------------------------X

BALTIC FOURTH LLC, directly and derivatively
on behalf of FOURTH AVENUE JV LLC,
FOURTH AVENUE MEZZ LLC, and FOURTH
AVENUE PROPERTY OWNER LLC, and TONA
CONSTRUCTION & MANAGEMENT LLC,

                         Plaintiffs,

             v.

MICHAEL STERN, JDS FOURTH AVENUE
LLC, and JDS CONSTRUCTION GROUP LLC,

                         Defendants,

FOURTH AVENUE JV LLC, FOURTH AVENUE
MEZZ LLC, and FOURTH AVENUE PROPERTY
OWNER LLC,
                         Nominal Defendants.

----------------------------------------------------------------X

Case No. 21-10888
U.S. Bankruptcy Court,
District of Delaware
(Chapter 11)

Adv. Proc. No. 21-01144-shl

**MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFFS' MOTION TO REMAND, FOR PERMISSIVE ABSTENTION AND
RELATED RELIEF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

I.     PRELIMINARY STATEMENT ..................................................................................... 1

II.    THE FACTS AND PROCEDURAL BACKGROUND ....................................................... 5

     A.    The Facts ............................................................................................................ 5

            1.    Formation of Joint Venture and JV Agreement ........................................... 5
            2.    Defendants Siphon Off Funds While Failing to Pay Baltic ........................... 8
            3.    Defendants Deny Access to Books and Records ..................................... 10
            4.    Defendants Enrich Themselves While Refusing to Distribute Funds to Baltic ........................................... 11

     B.    Procedural History ......................................................................................... 12

III.   ARGUMENT .............................................................................................................. 17

     A.    This Matter Should be Remanded ..................................................................... 17

     B.    Discussion of *Drexel* Factors ........................................................................... 18

     C.    Similar Cases Support Remand ....................................................................... 23

     D.    Costs, Expenses and Attorney's Fees Should be Awarded to Plaintiffs ........................................................................... 28

IV.   CONCLUSION .......................................................................................................... 30

## TABLE OF AUTHORITIES

28 U.S.C. §1447(c) .......................................................................................................28

AEG Liquidation Trust v. Toobro N.Y. LLC (In Re AM Equities
Group Inc.), 460 B.R. 123 (S.D.N.Y. 2011) .................................................................17

BGFI GP 1 LLC v. Prieto (In Re WP Realty Acquisition III LLC),
626 B.R. 154 (S.D.N.Y. 2021)......................................................................................18

Camofi Master LDC v. U.S. Coal Corp., 527 B.R. 138 (S.D.N.Y. 2015)..............17, 19

Circle Industries USA, Inc. v. Parke Construction Group, Inc.,
183 F.3d 105 (2d Cir. 1999)..........................................................................................28

Departmental Disciplinary Committee v. Shapiro (In Re Friedman &
Shapiro P.C.), 185 B.R. 143 (1995)..............................................................................28

Drexel Burnham Lambert Group, Inc. v. Vigilant Insurance Company,
130 B.R. 405 (S.D.N.Y 1991).........................................................................17, 18, 19

Gassman v. Gassman, Griper & Golodny, No. 97 civ. 0093,
1997 WL 603439 (S.D.N.Y., Sept. 30, 1997)........................................................ 23-24

Greenidge v. Mundo Shipping Corp., 60 F. Supp.2d 10 (E.D.N.Y. 1999)...................28

In Re Wild Oaks Utilities, Inc., 18 B.R. 959 (S.D.N.Y. 1982).....................................17

Little Rest Twelve, Inc. v. Visan, 458 B.R. 44 (S.D.N.Y. 2011) ...........................25, 29

Midlantic Nat'l Bank/Citizens v. Comtek Electronics, Inc. (In Re
Comtek Electronics, Inc.), 23 B.R. 449 (S.D.N.Y. 1982)..............................................19

ML Media Partners, LP v. Century/ML Cable Venture (In Re Adelphia
Communications Corp.), 285 B.R. 127 (S.D.N.Y. 2002).............................................19

Morgan Guaranty Trust Company of New York v. Republic of Palau,
971 F.2d 917 (2d Cir. 1992)....................................................................................28, 29

Nemsa Establishment, S.A. v. Viral Testing Systems Corp.,
No. 95 civ. 0277, 1995 WL 489711 (S.D.N.Y. Aug 15, 1995) ....................................17

Rahl v. Bande, 316 B.R. 127 (S.D.N.Y. 2004)............................................................18

Rednel Tower, Ltd. v. Riverside Nursing Home (In Re Riverside Nursing
Home), 144 B.R. 951 (S.D.N.Y. 1992)..........................................................................17

Renaissance Cosmetics, Inc. v. Development Specialists, Inc.,
277 B.R. 5 (S.D.N.Y. 2002)...........................................................................................................21

I.

PRELIMINARY STATEMENT

This adversary proceeding arrives before the Court as a product of desperate and sharp-edged tactics by defendants, Michael Stern (Stern) and JDS Construction Group LLC (JDS Construction) to avoid, at the absolute eleventh hour,[1] a trial that would expose the bad faith breaches and outright fraud and forgery engaged in by Stern and JDS Construction and establish their obvious liability to plaintiffs, Baltic Fourth LLC (Baltic) and Tona Construction and Management, LLC (Tona) (collectively, Plaintiffs).  This Court should view this latest procedural step for what it is, a baseless delay tactic, and grant the motion of Baltic and Tona to remand this case to the Supreme Court of the State of New York, County of New York, before the Honorable Judge Barry Ostrager (the State Court) so that Plaintiffs will be granted the long-awaited trial Stern, JDS Construction and debtor, JDS Fourth Avenue LLC (JDS Fourth) (collectively, Defendants) so inexcusably seek to avoid.

This lawsuit involves the ongoing scheme of Defendants, led by Stern, to unlawfully misappropriate millions of dollars in connection with the construction of a luxury condominium complex located in Brooklyn, New York (the Project).  Specifically, Defendants engaged in forgery, self-dealing, fraud, withholding of information and diversion of funds owed to Baltic and, through Baltic, to its owner, Domenick Tonacchio (Tonacchio), as well as blatant bad faith breaches of the parties' agreement.

Tonacchio, through a number of single-asset entities, assembled, over a period of decades, multiple parcels of contiguous real property that he believed would be an ideal location for a residential development.  Tonacchio made the mistake of sharing his vision for the property with

---

[1] The Notice of Removal was filed less than 24 hours before the start of trial.

Stern, an unscrupulous developer who looked at the Project as an opportunity to enrich himself and his alter ego companies, defendants, JDS Fourth and JDS Construction.  Stern induced Tonacchio to create Fourth Avenue JV LLC (the Joint Venture) by representing that he had significant lender relationships that would provide access to low-cost capital and by ensuring Tonacchio that he had no objection to Tona, Tonacchio's construction company, acting as construction manager.  In return, Tonacchio agreed that JDS Fourth would act as manager for the Joint Venture and JDS Fourth Avenue Developer LLC (JDS Developer), another Stern entity, would act as Project developer.

Instead, once the Joint Venture was established, with JDS Fourth in place as managing member and JDS Developer as developer, Stern used his position to push out Tonacchio, taking over construction management as well so that Stern could control all aspects of the Project -- owner, developer and construction manager.  Stern then used this complete control to self-deal and pillage Project proceeds in order to enrich Defendants.

Stern's takeover of construction management was entirely planned from the beginning. Indeed, shortly after he entered the Joint Venture with Baltic, Stern openly and candidly conspired with Nicholas Werner of Largo Investments (Largo), who became Stern's junior partner in JDS Fourth, to "paper the construction management" to "take that over as well" and considering "[h]ow do we actually take it over from Tenacio (sic)."  In order to carry out this goal, Stern, or someone at his direction, ultimately forged Tonacchio's signature to several documents which, among other terms, provide Baltic's consent to JDS Construction acting as Project construction manager, consent necessary to install JDS Construction in that position.  Defendants then, throughout the Project, refused to provide Baltic with documentation to which it was expressly entitled under the

MEMORANDUM OF LAW IN SUPPORT – PAGE 2

JV Agreement in order to conceal, for as long as possible, their misconduct and the extent to which they were diverting Project resources to Defendants.

Ultimately, Baltic and Tona were forced to bring suit, engaging in a lengthy and extremely costly litigation in the State Court, as Defendants used every possible tactic to avoid disclosure of their misconduct, while also doing all they could to drive up Plaintiffs' cost in the hope that Plaintiffs would be unable to continue the fight. Plaintiffs persevered, however, pressing this matter forward at great cost and, ultimately, after the State Court threatened to strike Defendants' pleadings for non-compliance with their discovery obligations, securing much of the needed information.

This disclosure established that Defendants (1) diverted millions of dollars in Project loan and sale proceeds by making excessive general conditions payments of over $3.9 million to JDS Construction beyond a guaranteed price, (2) mismanaged the Project at the cost of $1.6 million for defective work, (3) diverted over $2.1 million in distributable funds payable to Baltic under the JV Agreement to pay Defendants' legal and expert fees in the State Court action, and (4) overpaid themselves over $1.5 million for a purported "member loan." The evidence also establishes, overwhelmingly, that Stern committed forgery and fraud, as well as breaches of fiduciary duty, creating personal exposure for himself as well as on the part of JDS Construction.

Finally, after pushing through Defendants' delays and bad faith litigation tactics, Plaintiffs were able to secure a trial date, which has been known to the parties for over seven months. Faced with their day of reckoning, Defendants repeatedly sought to push off the trial. First, when discovery was concluding and Plaintiffs sought to arrange for an extended discovery date for expert depositions, Defendants refused unless Plaintiffs would agree to adjourn the trial. When Plaintiffs rejected this demand, Defendants then, months later, reversed their position, arguing to

the Court that the trial needed to be adjourned so that expert discovery could take place. This, too, was rejected.

Thereafter, after Plaintiffs filed a Note of Issue providing for a bench trial, which had been repeatedly discussed with the State Court by all parties, Defendants again reversed themselves, demanding a jury trial for all Defendants on all issues in an attempt to delay the matter from moving forward since, at the time, jury trials had been suspended due to the COVID-19 pandemic. The State Court, however, bifurcated the claims, providing for a bench trial against JDS Fourth, which had waived its right to a jury trial, while ordering that a jury trial would follow against defendants, Stern and JDS Construction. Defendants then made a final effort at the last pre-trial conference on April 29th to adjourn the trial for three months, which request was quickly rejected by the State Court. As a result, despite their best efforts on four occasions, Defendants could not prevent the trial from moving forward.

When each of these efforts were rejected, Defendants played their last card. Less than 24 hours before the bench trial was to begin, JDS Fourth filed for bankruptcy protection under Chapter 11. There had been no change in JDS Fourth's circumstances in the weeks or months before trial that would make such a bankruptcy necessary. Indeed, JDS Fourth is a special purpose entity whose sole purpose is to hold a 50 percent interest in the Joint Venture and, thus, JDS Fourth never possessed any other real assets or even a bank account of its own. Moreover, the bankruptcy was filed without the consent of Largo, the co-owner of JDS Fourth, which was required, for Largo too has brought its own claims against Stern for fraud.[2] Nonetheless, Defendants filed for bankruptcy as a way of delaying the bench trial and removing the claims against Stern and JDS Construction

---

[2] Largo has now moved to dismiss JDS Fourth's bankruptcy on the basis that it was not filed with Largo's required authority or in good faith.

to federal court in order to derail the upcoming jury trial.  In fact, JDS Fourth has now acknowledged retaining bankruptcy counsel on May 28th, one business day ahead of the June 1st removal date.

As set forth below, however, review of the factors surrounding this matter overwhelmingly support remanding the case back to State Court so that the trial, long awaited, can move forward and a jury can resolve the claims against Stern and JDS Construction, which have always been the real parties behind JDS Fourth.  Indeed, JDS Fourth did not even maintain any employees but, rather, all of its duties under the JV Agreement were performed by JDS Construction and controlled, ultimately, by Stern.

Accordingly, Defendants' blatant bad faith tactics should be rejected, and Plaintiffs respectfully request that this matter be returned to State Court immediately so that the trial can proceed before Judge Ostrager, who has managed this action since its commencement.

II.
THE FACTS AND PROCEDURAL BACKGROUND

A.    The Facts.

1.    Formation of Joint Venture and JV Agreement.

Beginning in 1983, Tonacchio, through a number of single-asset entities, acquired certain real property located at 613-615 Baltic Street and 107, 109, 109A, 111 and 113 Fourth Avenue in Brooklyn, New York (collectively, the Property).  Despite receiving offers of over $26 million to sell the Property, Tonacchio wished to develop it and looked for a partner with the financial strength and lender relationships to assist him.  Stern, the owner of JDS Fourth, represented that

he had such financial strength and relationships and expressed an interest in entering into a joint venture with Baltic.[3]

In late 2013, Baltic and JDS Fourth entered into a short form joint venture agreement, creating the Joint Venture. The joint venture agreement was later amended and restated in April 2014 (the JV Agreement).[4]

The Joint Venture founded, and became the sole member of, a new entity, Fourth Avenue Owner LLC (Property Owner). Property Owner was created to acquire the Property and construct the Project.[5]

Under the JV Agreement, JDS Fourth is named the manager and a member of the Joint Venture while Baltic is a member. As manager, JDS Fourth was obligated to maintain complete and current books of account and records for both the Joint Venture and Property Owner. Baltic was expressly entitled to review these records pursuant to the JV Agreement.[6]

Under the JV Agreement, one of Stern's other companies, JDS Developer, was to act as developer for the Project, receiving a fee of four percent of the Project's hard and soft costs. Under Section 8.9 of the JV Agreement, Tona was to act as construction manager for the Project, arranging for and overseeing construction in return for a three percent fee of the aggregate "hard costs" of construction.[7]

---

[3] Declaration of Stephen J. Gillespie, dated June 30, 2021 (Gillespie Dec.), Exhibit A (Affidavit of Domenick Tonacchio, sworn to February 11, 2021 (Tonacchio February Aff.), ¶¶2-3). The entities holding the Property were, at the time, in bankruptcy. Gillespie Dec., Exhibit B (Affidavit of Domenick Tonacchio, sworn to May 28, 2021 (Tonacchio May Aff.), ¶4).
[4] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶4, Exhibit 1 (JV Agreement)).
[5] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶5).
[6] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶6, Exhibit 1 (JV Agreement, Sections 1.1, 7.1 and 8.1)). Baltic is defined as "Tonacchio" in the first paragraph of the JV Agreement.
[7] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶7, Exhibit 1 (JV Agreement, Section 8.9)).

Tona's role as construction manager allowed Tona to manage and control the construction process and attendant costs. For its part, JDS Fourth's position as managing member of the Joint Venture, and thus its control of Property Owner, would allow it to review and approve construction costs and payments to Tona, establishing reasonable checks and balances between the members for accountability on costs.[8]

Section 5 of the JV Agreement sets forth how anticipated Project profits, referred to as Distributable Funds, are to be distributed. Section 5.1 entitles Baltic to a payment of $1,000,000 on the closing of the acquisition of the Property and a second $1,000,000 a few months later. Following these initial payments, Section 5.2 contains a "waterfall" provision for profit distributions, specifically providing:

> Distributable Funds, if any, shall be distributed to the Members quarterly or more frequently from time to time as determined by [JDS Fourth]. Such Distributable Funds shall be distributed in the following order and priority:
>
> **(i)    First, Fourteen Million and 00/100 Dollars ($14,000,000.00) to Tonacchio;**
> (ii) Second, Five Million and 00/100 Dollars ($5,000,000.00) to [JDS Fourth]; and
> (iii) Thereafter, one hundred percent (100%) to the Members in proportion to their respective Percentage Interests at the time of such distribution. (emphasis added)[9]

Section 5.2 provides that Distributable Funds are to be distributed by JDS Fourth "quarterly or more frequently from time to time as determined by the Manager."[10]

---

[8] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶7). Tona had extensive experience as a construction manager, including for no less than seven similar developments in Park Slope, Brooklyn, including four on Fourth Avenue (where the Project is located). Id.

[9] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶9, Exhibit 1 (JV Agreement, Sections 5.1 and 5.2)).

[10] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶12, Exhibit 1 (JV Agreement, Section 5.2). Based on JDS Fourth's Pro Forma Projection of $31,579,559 in profit, and assuming JDS Fourth paid $5,000,000 in soft costs, Baltic should have recovered a total of $20,289,779.50 and JDS Fourth $11,289,779.50. This would have been exclusive of construction management and

2.      Defendants Siphon Off Funds While Failing to Pay Baltic.

Although Tona was intended to act as construction manager for the Project under the JV Agreement, Stern and the other Defendants never intended to allow Tona to do so.  Instead, after entering into the JV Agreement, Stern began scheming to push out Tonacchio and Tona so that Stern could control all aspects of the Project.  This scheme was reflected in Stern's November 2014 email exchanges with Nicholas Werner of Largo (which ultimately obtained a 49 percent interest in JDS Fourth), during which they openly discussed how to "paper the construction management of the project so we can formally take that over as well" while considering "[h]ow do we actually take it over from Tenacio (sic)."[11]

Ultimately, Stern and the other Defendants accomplished this goal through a series of fraudulent actions culminating in the forgery of Tonacchio's name to certain documents consenting to the replacement of Tona with JDS Construction, Stern's own entity.[12]  This change allowed Defendants not only to secure the construction management fee intended for Tona, $1,097,422, but also, and even more damaging, to use loan and sales proceeds, without restraint, to "reimburse" JDS Construction for exorbitant general conditions, labor and other "costs."[13]

In short, as Defendants intended, the usual checks and balances ensuring the reasonableness of such costs were obliterated when Stern controlled the construction manager, owner and developer.  Indeed, Stern even signed the construction management agreement on

---

development fees.  Gillespie Dec., Exhibit A (Tonacchio February Aff., Exhibit 2 (Pro Forma Projection)).

[11] Gillespie Dec., Exhibit C (Largo email exchange produced in discovery).

[12] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶13).  The evidence supporting this forgery is overwhelming, including not only third-party witnesses that have attested that Tonacchio was not present at the closing when the documents were signed but also a handwriting expert.  See Gillespie Dec., Exhibit D (Expert Handwriting Report and related Affidavits).

[13] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶13).

behalf of both Property Owner and JDS Construction, and confirmed during testimony that employees of JDS Construction "negotiated" the construction management agreement and its Guaranteed Maximum Price Amendment (the GMP Amendment) on behalf of <u>both</u> JDS Construction and Property Owner.[14]  This total control allowed Defendants to put in place an entirely one-sided, unreasonable, unauthorized and invalid construction management agreement, containing onerous terms favoring JDS Construction.  It also allowed Defendants unrestricted access to loan and sales proceeds as Stern directed JDS Construction to create bills that he could then approve and pay through Property Owner.[15]

Indeed, the evidence establishes that the general conditions charged by JDS Construction, and paid by Property Owner under the control of JDS Fourth, were in a total amount of $6,610,478 (net of insurance costs).  This amount was $3,978,475 higher than the maximum general conditions line-item amount set forth in the GMP Amendment of $2,632,003.  Further, this amount is 22.5 percent of the Project's trade GMP costs, far above industry standards of seven to ten percent.  As a result, JDS Fourth, through Property Owner, paid JDS Construction $3,978,475 for general conditions in excess of the GMP amount.[16]

Further, retaining JDS Construction as construction manager led to mismanagement of the Project, including regarding the trade contractors' performance of punch list and remedial work. Specifically, rather than keep JDS Construction responsible for the work of trade contractors it was paid to manage, JDS Fourth (solely administered by Stern and JDS Construction employees)

---

[14] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶¶13-14, Exhibit 3 (signature page to Construction Management Agreement)); Exhibit E (Michael Stern EBT Transcript, pp. 152-156)).
[15] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶¶13-14); Exhibit B (Tonacchio May Aff., ¶¶61-63).
[16] Gillespie Dec., Exhibit F (Affidavit of John Ciccarelli, sworn to on May 28, 2021 (Ciccarelli Aff.), ¶¶39-42).

<u>MEMORANDUM OF LAW IN SUPPORT – PAGE 9</u>

improperly agreed to exclude the cost of defective work.  Thereafter, with no incentive to address

this issue, JDS Construction failed to properly manage the trade contractors or to require them to

perform punch list and remedial work.  Instead, in various cases, JDS Construction closed out trade

contracts or simply did not require trade contractors to return, and then hired new trade contractors

to perform remedial and punch list work for which they had already made payment to the original

trades.  This mismanagement resulted in excess payments of $1,601,991.[17]

       3.    <u>Defendants Deny Access to Books and Records.</u>

Defendants also repeatedly frustrated Baltic's efforts to trace the distribution of loan and

sales proceeds, as well as to confirm appropriate construction and related costs, needed to establish

the amount of Distributable Funds generated by the Project.  Specifically, during the Project's

construction, as well as multiple times following completion, Baltic made no less than nine

requests to review books and records of the Joint Venture and Property Owner.[18]

While some selective, limited records were provided, Baltic was not afforded access to,

nor provided copies of, the complete books and records.  Among other things, JDS Fourth refused

to provide Baltic with the books and records reflecting the full costs of construction, including for

JDS Construction's general conditions costs, including payroll (JDS Construction's employees),

exceeding $6.5 million.[19]  In fact, JDS Construction's "invoices" for payroll submitted to JDS

Fourth, copies of which were only reluctantly provided, were single pages, with no backup or

supporting documentation, despite aggregating more than $4.4 million.[20]  While such deficient and

---

[17] Gillespie Dec., Exhibit F (Ciccarelli Aff., ¶¶43-60).

[18] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶18, Exhibits 4 through 12 (Requests for Books and Records)).

[19] Gillespie Dec., Exhibit B (Tonacchio May Aff., ¶94).

[20] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶19, Exhibit 13 (Sampling of JDS Payroll Invoices)).

<u>MEMORANDUM OF LAW IN SUPPORT – PAGE 10</u>

un-auditable invoices would never have been accepted in an arms-length transaction, they were readily paid by Project Owner, controlled by Stern.[21]

In short, despite the express terms of the JV Agreement, and repeated demands, JDS Fourth purposely precluded Baltic from examining the complete books and records of the Joint Venture and Property Owner.  As a result, Baltic had no way to determine the true cost of construction or to review the distribution of Project funds and, so, was precluded from taking steps to mitigate the improper depletion of loan and Project proceeds.[22]

4.      Defendants Enrich Themselves While Refusing to Distribute Funds to Baltic.

Defendants' failure to provide information was not inadvertent.  It was, instead, part of an ongoing scheme designed to remove control from Baltic in order to allow Defendants to syphon off, as they wished, the proceeds generated by the Project loans and the sale of the condominium units.  Even a preliminary review of the purported costs of construction demonstrates that the general conditions and related "costs" paid to JDS Construction and others on its behalf are far in excess of the reasonable costs to construct and manage the Project.[23]

Moreover, the evidence clearly establishes the existence of Distributable Funds.  Among other things, $2,182,626 of Project proceeds were improperly paid by JDS Fourth to cover Defendants' legal and expert witness fees in this litigation.[24]  Under the express terms of the JV Agreement, Defendants had no right to make such payments, and these amounts were Distributable Funds owed to Baltic.[25]

---

[21] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶20).

[22] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶24).

[23] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶25).  General conditions reflect the field overhead, supervision and administration costs needed to manage the Project.

[24] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶27); Exhibit G (legal and expert witness fees inappropriately paid by Defendants).  See also, Exhibit I (bank statements).

[25] Gillespie Dec., Exhibit A (Tonacchio February Aff., Exhibit 1 (JV Agreement, Section 12.11)).

In addition, JDS Fourth improperly paid Defendants additional Distributable Funds that should have been paid to Baltic.  Specifically, JDS Fourth paid $1,567,773 in Project proceeds to JDS Construction in overpayment of a purported member loan.[26]

Further, the evidence shows that a recent closing of the Project's final unit, Retail Unit B, created net proceeds of approximately $1,400,000, which funds have been reduced to about $900,000 after payments were again improperly made for Defendants' legal and expert fees.[27] These remaining proceeds constitute Distributable Funds that should have been paid to Baltic but, once again, have been withheld by JDS Fourth in breach of the JV Agreement.

Plaintiffs had been pursuing all of these claims in the State Court, seeking millions of dollars in damages, as well as counsel fees and punitive damages, and expecting to try this action on June 2nd before Defendants' last minute, desperate act to avoid trial.

B.    Procedural History.

The procedural history is contained in the Gillespie Declaration accompanying this motion. For the Court's ease of reference, below are the relevant dates and events with regard to this matter:

| October 2, 2018 | Plaintiffs filed Complaint against Defendants.  Gillespie Dec., Exhibit J. |
| December 21, 2018 | Plaintiffs filed First Amended Complaint against Defendants containing 14 causes of action.  Gillespie Dec., Exhibit K. |
| February 8, 2019 | Defendants filed Verified Answer with Affirmative Defenses. Gillespie Dec., Exhibit L. |
| June 3, 2019 | Defendants filed second Motion to Dismiss the Amended Complaint. |
| October 17, 2019 | Order of the Honorable Judge Barry Ostrager denying the Motion to Dismiss and dismissing only 3 of the 14 causes of action.  Gillespie |

---

[26] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶27); Exhibit H (Affidavit of Robert Kriegstein, sworn to on February 12, 2021 (Kriegstein Aff.), ¶¶4-5, Exhibit 1 (Capital Contribution analysis)).

[27] Gillespie Aff., Exhibit I (April 2021 bank statement).

| | |
|---|---|
| | Dec., Exhibit M (later motion to reargue was denied - Gillespie Dec., Exhibit N). |
| 2019 to 2021 | Discovery proceeds with production of documents and responses to interrogatories. |
| February 14, 2020 | Plaintiffs filed Motion for Attachment of proceeds from sale of condominium units. |
| March 23, 2020 | Order of Judge Ostrager denying motion for attachment with leave to renew upon further evidence of fraud or that Defendants would potentially be unable to satisfy a judgment.  March 23rd Order also states, **"It is clear that Plaintiffs have been given very little information about the recent sales and still lack complete access to Defendants' books and records."**  Defendants ordered to **"provide Plaintiffs with full access to books and records within 20 days from the date of this decision."** (emphasis added).  Gillespie Dec., Exhibit P. |
| April 29, 2020 | Order of Judge Ostrager under which Defendants compelled to provide discovery to "produce within the next 40 days all bank statements, checks, and check registers relating to the properties at issue in this case from the inception of the joint venture through and including May 31, 2020."  Gillespie Dec., Exhibit Q. |
| June 2020 | Defendants produced some documents including incomplete bank statements and redacted pages. |
| July 1, 2020 | Order of Judge Ostrager stating that the Court held a discovery conference relating to Defendants' non-compliance with the Court's April 29th Order, compelling the production of books and records, which had been repeatedly sought at multiple discovery conferences.  Judge Ostrager's order also found that **"the failure of the defendants to comply within twenty (20) days with the orders issued by the Court on July 1, 2020 will result in the striking of defendants' Answer to the Complaint for abuses of the discovery process and willful non-compliance with discovery orders."** (emphasis added).  Gillespie Dec., Exhibit R (Order). |
| July 1, 2020 | The Court also found with regard to Defendants' misconduct that **"I believe you are playing games.   It has been at least six conferences of discussions and orders directing you to explain with precision how much money has come in, how much money has gone out and to whom it has gone out to.   There is nothing complicated about that."**  The Court also found when speaking of Defendants, **"I have lost patience with the Defendants in this case. And I do not believe you're conducting this case in good faith."** |

| | |
|---|---|
| | (emphasis added). Gillespie Dec., Exhibit R (transcript), pp. 40-41, lines 17-9. |
| August 31, 2020 | The Court issued an Order reaffirming that the trial would commence on January 7, 2021, and later an amended order directing that "the note of issue in this case with more than 250 docket entries is to be filed on or before November 30, 2020," along with a notification that if a ruling by the Appellate Division is not rendered before the scheduled trial date, the Court would entertain applications to adjourn the trial pending the appeal.  Gillespie Dec., Exhibits S and T. |
| October 23, 2020 | The parties submitted a stipulation to the Court allowing for additional time for discovery with completion of factual discovery on December 18, 2020 and expert discovery by February 5, 20[21], with all dispositive motions filed by February 21st and Note of Issue on that same day.  The October 23rd So Ordered Stipulation also determined the trial date would be scheduled on June 2, 2021.  The October 23rd Order gave the parties more than seven months' notice of the trial date.  Gillespie Dec., Exhibit U. |
| January 26, 2021 | Court conference held with Judge Ostrager who declines to extend completion of factual and expert discovery.  Counsel for Plaintiffs and Defendants agree to conduct expert discovery after filing Note of Issue and Plaintiffs send stipulation to Defendants' counsel reflecting that agreement.  Gillespie Dec., Exhibits V and W. |
| January 27, 2021 | Defendants' counsel decline to execute the stipulation extending discovery informing Plaintiffs that they would only agree to extend discovery if the trial date of June 2nd were moved.  Plaintiffs did not agree to this request. Gillespie Dec., Exhibit W. |
| January 26, 2021 | During the conference, Judge Ostrager asked if the trial would be a bench trial or a jury trial and Plaintiffs responded that it would be a bench trial and Defendants offered no response.  The Court then spent a few minutes to discuss the procedures for a bench trial. Gillespie Dec., ¶38. |
| January 26, 2021 | Order of Judge Ostrager, which confirmed the deadlines for the Note of Issue and stated, **"the June 2, 2021 trial date for which provision was made in the parties' most recent pre-trial stipulation remain firm and will not be changed for any reason."** (emphasis added).  Gillespie Dec., Exhibit V. |
| February 12, 2021 | Plaintiffs move for partial summary judgment and Defendants move for summary judgment and complete dismissal of the Complaint. |

<u>MEMORANDUM OF LAW IN SUPPORT – PAGE 14</u>

| February 12, 2021 | Plaintiffs file Note of Issue without a jury demand.  Gillespie Dec., Exhibit X. |
| February 26, 2021 | Defendants file a demand for a jury trial of all matters in this action. Gillespie Dec., Exhibit Y.  A jury trial had never been previously discussed and was contrary to the discussions at the January 26th Court conference.  At the time of February 26, 2021, jury trials were not being heard in New York County due to the COVID-19 pandemic.  Gillespie Dec., ¶41. |
| April 7, 2021 | Judge Ostrager hears oral argument on the competing motions for summary judgment and denies Defendants' motion for summary judgment in its entirety and partially grants Plaintiffs' motion for partial summary judgment.  During the conference, the Court also confirmed that the trial in the action was scheduled for June 2, 2021. Gillespie Dec., Exhibit Z. |
| April 29, 2021 | Final pre-trial conference is held before Judge Ostrager, who determines that the trial will proceed in two phases, with a bench trial on June 2, 2021, and then a jury trial immediately after the bench trial or schedule for a later date.  Gillespie Dec., Exhibit AA (Order). During the April 29th pre-trial conference, the Court also set deadlines for the parties to submit a joint exhibit list, list of witnesses, designation of deposition testimony and pre-trial memoranda if desired, to be submitted by May 19, 2021.  Id. Significantly, since it was a bench trial, Judge Ostrager also required that Plaintiffs file direct examination affidavits on May 28, 2021, and Defendants' file direct examination affidavits on June 1, 2021.  Id. |
| April 29, 2021 | Defendants also requested a three-month adjournment of the trial date, which request was denied.  During the conference, the Court held:  "[s]o we're going to trial on June 2nd.  That's no prejudice to either party.  Everybody has been on notice of the June 2nd trial date for a very long time, and we've dealt with motions in anticipation of the June 2nd trial date." (emphasis added.) Gillespie Dec., Exhibit AA, pp. 10-11, lines 21-25. |
| May 10, 2021 | Defendants' counsel wrote to the Court concerning expert depositions, requesting permission to take those depositions, despite previously not agreeing to expert depositions after the Note of Issue, and also asking the Court, yet again, to "adjourn the June 2nd trial date to allow for adequate time to conduct those depositions without further prejudicing Defendants' ability to prepare for trial." Gillespie Dec., Exhibit BB. |

| | |
|---|---|
| May 11, 2021 | Plaintiffs responded to Defendants' letter concerning expert depositions, advising that Defendants were using the expert depositions as another attempt to delay the trial, since Defendants had been in possession of Plaintiffs' expert witness reports since February 2021.  Gillespie Dec., Exhibit CC. |
| May 11, 2021 | The Court issued a ruling stating, **"The long scheduled June 2, 2021 bench trial will proceed as scheduled with the jury trial to follow if the bench trial is reasonably expeditious and there can be an adequate number of available jurors."** (emphasis added).   The Court also allowed each side to take two expert depositions before the commencement of the June 2, 2021 trial.  Gillespie Dec., Exhibit DD.   Notably, Defendants never sought to schedule their expert depositions. |
| May 11 – May 27, 2021 | Defendants and Plaintiffs conferred via telephone email multiple times on May 17th, 18th, 19th, 20th, 25th, 26th and 27th, regarding exhibits and related issues concerning trial, including joint trial exhibit list and redaction of trial exhibits.  Gillespie Dec., Exhibit EE. |
| May 19, 2021 | Plaintiffs file joint exhibit list, pre-trial memorandum, proposed findings of fact, designation of deposition testimony to be read and witness list. |
| May 19, 2021 | Defendants file only a list of witnesses. |
| May 28, 2021 | Plaintiffs file seven affidavits of direct examination for its witnesses, totaling 99 pages.  Three affidavits are from expert witnesses along with four affidavits from factual witnesses, including a thirty-six-page affidavit from Domenick Tonacchio, managing partner of Baltic. |
| May 28, 2021 | JDS Fourth has retained bankruptcy counsel and sends wire transfer of $51,738 to Cousins Law LLC to represent JDS Fourth in bankruptcy.  Gillespie Dec., Exhibit FF. |
| May 28, 2021 at 5:13 p.m. | Defendants write to the Court complaining of trial subpoenas of Chase Bank and for trial subpoenas for two of Defendants' witnesses.  **In their letter, Defendants request that "the Court order Plaintiffs to withdraw their subpoenas and proceed to trial on the voluminous fact record already in existence."** (emphasis added.)  Gillespie Dec., Exhibit GG. |
| June 1, 2021 at approximately 10:38 a.m. | Defendants electronically file Notice of Removal of State Court proceedings to the Southern District of New York.  Gillespie Dec., |

| | Exhibit II.  Notably, Defendants do not file their affidavits of direct examination on June 1, 2021. |
| June 10, 2021 | Largo files motion to dismiss the JDS Fourth bankruptcy.  Gillespie Dec., Exhibit KK. |

III.
ARGUMENT

A.    This Matter Should be Remanded.

Under 28 U.S.C. §1452(b), a Court may remand claims removed to federal court on any equitable ground.  "A Court has broad discretion in conducting the equitable remand analysis." Camofi Master LDC v. U.S. Coal Corp., 527 B.R. 138 (S.D.N.Y. 2015), *citing* AEG Liquidation Trust v. Toobro N.Y. LLC (In Re AM Equities Group Inc.), 460 B.R. 123, 128 (S.D.N.Y. 2011).

"Seven factors are commonly considered in the equitable remand analysis: (A) the effect on the efficient administration of the bankruptcy estate; (B) the extent to which issues of state law predominate; (C) the difficulty or unsettled nature of the applicable state law; ([D]) comity; ([E]) the degree of relatedness or remoteness of proceeding to the main bankruptcy case; (F) the existence of the right to a jury trial; and (G) prejudice to the involuntarily removed defendant(s)." See Camofi Master LDC, 527 B.R. at 143, *citing* In Re American Equities, 460 B.R. at 128 (*citing* Drexel Burnham Lambert Group, Inc. v. Vigilant Insurance Company, 130 B.R. 405, 407 (S.D.N.Y 1991).  See also Rednel Tower, Ltd. v. Riverside Nursing Home (In Re Riverside Nursing Home), 144 B.R. 951 (S.D.N.Y. 1992); In Re Wild Oaks Utilities, Inc., 18 B.R. 959, 963 (S.D.N.Y. 1982).

"Two additional factors often considered include the 'duplicative and economical use of judicial resources' and the 'lessened possibility of inconsistent results'." See Camofi Master LDC, 527 B.R. at 143 (*citing* Nemsa Establishment, S.A. v. Viral Testing Systems Corp., No. 95 civ. 0277, 1995 WL 489711, *7 (S.D.N.Y. Aug 15, 1995)).

MEMORANDUM OF LAW IN SUPPORT – PAGE 17

In addition to seeking remand, Plaintiffs alternatively seek permissive abstention of the State Court proceeding under Section 1334(c)(1). "The factors considered in deciding whether to equitably remand under Section 1452(b) are substantially similar to those considered when deciding whether to permissibly abstain under Section 1334(c)(1)." See BGFI GP 1 LLC v. Prieto (In Re WP Realty Acquisition III LLC), 626 B.R. 154 (S.D.N.Y. 2021), *citing* Rahl v. Bande, 316 B.R. 127, 135 (S.D.N.Y. 2004).

B.    Discussion of *Drexel* Factors.

The Drexel[28] factors, cited in connection with equitable remand, support both permissive abstention and equitable remand.  First, the remand to State Court will promote efficient administration of the bankruptcy estate as the State Court action can be heard immediately, as it was scheduled for trial the day after JDS Fourth filed the bankruptcy petition.  In addition to having the claims against JDS Construction and Stern resolved, the proceeding in State Court will allow a determination of the claim (though not enforcement) against JDS Fourth well ahead of any bankruptcy proceedings.[29]  This will allow efficient liquidation of the claim against the JDS Fourth bankruptcy estate.  It simply cannot be disputed that the State Court will deal with this matter more quickly, given that Judge Ostrager was prepared to hear the trial on June 2nd, as opposed to the federal courts, which have no background in dealing with this matter and/or the parties and thus, are not prepared for trial.

Second, state law issues predominate the State Court proceeding as all claims, and all raised defenses, are subject to state law.  Specifically, the Amended Complaint has eleven causes of action for breach of contract, fraud, breach of fiduciary duty and declaratory judgment, among

---

[28] See Drexel Burnham Lumber Corp. Inc. v. Vigilant Insurance Company, *supra*.
[29] In the alternative, Plaintiffs would request the matter be remanded to State Court for adjudication against Stern and JDS Construction.

MEMORANDUM OF LAW IN SUPPORT – PAGE 18

others.[30]  All are plead under New York law.  In addition, the choice of law provisions of the JV

Agreement provides for New York law to apply.[31]

Third, while the nature of New York law is not unsettled with regard to breach of contract,

breach of fiduciary duty and fraud claims, the New York Courts still have greater expertise in this

area.  See Midlantic Nat'l Bank/Citizens v. Comtek Electronics, Inc. (In Re Comtek Electronics,

Inc.), 23 B.R. 449, 451 (S.D.N.Y. 1982) (in a state law action, and " 'state court is better able to

respond' to a suit involving state law.").  See also Drexel, 130 B.R. at 408.  New York Courts

almost always apply New York law, and this matter, including New York State law, should be

heard by the court best equipped to handle it.

Fourth, comity also favors equitable remand.  "Comity focuses on the state's interest in

developing its law and applying its law to its citizens."  See Camofi Master LDC, *supra*, *citing*

ML Media Partners, LP v. Century/ML Cable Venture (In Re Adelphia Communications Corp.),

285 B.R. 127, 146 (S.D.N.Y. 2002).  Here, Plaintiffs, Baltic and Tona, are limited liability

companies founded and existing under New York law.  Likewise, defendant, JDS Construction, is

a limited liability company organized under New York law, along with Michael Stern being a New

York citizen at the time the State Court action was filed.  JDS Fourth and Baltic also agreed that

New York law would apply to any disputes and in interpreting the terms of the JV Agreement.[32]

Furthermore, the dispute arises over profits for a real estate project developed and sold in New

York.[33]  Accordingly, comity supports remand since it would allow New York State Courts to

---

[30] See Gillespie Dec., Exhibit K (First Amended Complaint).

[31] See Gillespie Dec., Exhibit A (Tonacchio February Aff., Exhibit 1 (JV Agreement, §12.6)).

[32] Id.

[33] Gillespie Dec., Exhibit A (Tonacchio February Aff., ¶2).

develop its law in these areas and resolve a dispute between New York citizens involving development of a property in Brooklyn, New York.

Fifth, the State Court proceeding is relatively remote to the bankruptcy proceeding. The primary target defendants in the State Court action are Stern and JDS Construction. The debtor, JDS Fourth, was always known to not have any bank accounts nor any real assets. Rather, JDS Fourth is a special purpose entity formed to hold 50 percent in the Joint Venture, which is the sole member of Property Owner.[34] At this juncture, JDS Fourth has no assets as all condominium units previously owned by Property Owner have been sold.[35] Indeed, given that JDS Fourth is a special purpose entity, there does not even appear to be a plausible basis to "reorganize" under Chapter 11. Moreover, JDS Fourth's partner, Largo, has already moved to dismiss the JDS Fourth bankruptcy as the bankruptcy was not authorized by Largo (as required by the operating agreement) and was filed in bad faith, as such filing was made purely for a tactical ligation advantage.[36] Indeed, the bankruptcy filing was done not only the day before the trial of the State Court action, but hours before a hearing in Largo's action in which Largo was seeking to strike Defendants' pleading for ongoing discovery abuse.[37]

Sixth, as noted in the Gillespie Declaration, Defendants requested a jury trial in the State Court action.[38] Under N.Y. C.P.L.R. §4102(a), Plaintiffs' consent would be needed for Defendants to withdraw their jury trial demand. Plaintiffs will not consent to withdraw a jury trial and, indeed, at this point, intend to proceed against Stern and JDS Construction by a jury trial. In addition, as

---

[34] Gillespie Dec., Exhibit A (Tonacchio February Aff., Exhibit 1 (JV Agreement, Section 1.1 and Exhibit A).
[35] Gillespie Dec., ¶22.
[36] Gillespie Dec., Exhibit GG (Largo's motion to dismiss).
[37] Id., ¶3.
[38] Gillespie Dec., Exhibit Y (jury demand).

<u>MEMORANDUM OF LAW IN SUPPORT – PAGE 20</u>

noted in Judge Ostrager's May 11, 2021 Order, a jury trial was to be scheduled shortly after the trial to be held on June 2, 2021.[39]  Without removal, Plaintiffs' right to a jury trial might be compromised in bankruptcy court.  See Renaissance Cosmetics, Inc. v. Development Specialists, Inc., 277 B.R. 5 (S.D.N.Y. 2002) ("Pursuant to 28 U.S.C. §157(e), a bankruptcy court may only conduct a jury trial if both parties expressly consent and a special designation of jurisdiction is granted by the district court.").  Indeed, without remand, Defendants could, in bankruptcy court, now withdraw their jury demand (over Plaintiffs' objection), which would prevent a jury from hearing this case, despite that in State Court, Defendants could not withdraw the jury demand without Plaintiffs' consent under N.Y. C.P.L.R. §4102(a).  Having filed a jury demand in an attempt to delay the trial, Defendants should not now be able to evade one.

Seventh, there is no prejudice to the involuntarily removed Defendants as the matter was in New York Courts and was to proceed directly to trial.  Indeed, the involuntarily removed Defendants are JDS Construction, a New York limited liability company with a New York office at 104 5th Avenue, New York, New York, along with its owner and principal, Stern, each of whom have significant contacts to New York.  By contrast, Defendants intend to seek to transfer this matter to the bankruptcy court in Delaware,[40] which would cause substantial prejudice to Plaintiffs.

With regard to the two additional factors, there has been great prejudice to the involuntarily removed Plaintiffs in this action.  Plaintiffs have been awaiting trial of the State Court action for approximately three years and were denied the opportunity to proceed by the removal of the State Court action to federal court.  In fact, the timing of the bankruptcy demonstrates its suspect nature, occurring less than 24 hours before the trial was to begin on June 2, 2021.  Stern and the other

---

[39] Gillespie Dec., Exhibit DD (May 11, 2021 Order).
[40]  Gillespie Dec., Exhibit II (Notice of Removal).

Defendants gave no prior notification of any pending bankruptcy filing or removal and, in fact, had written to the Court on May 28, 2021, at 5:13 p.m., mere days before trial, requesting that the Court direct that "the Plaintiffs should proceed to trial."[41]  By May 28th though, Defendants had already retained bankruptcy counsel.[42]  In addition, Defendants waited until they received considerable trial documents from Plaintiffs, including seven sworn affidavits of direct examination of Plaintiffs' witnesses, totaling 99 pages, before filing the bankruptcy and removal. Thus, this filing allowed Defendants the benefit of receiving Plaintiffs' direct testimony, but not having to submit their own direct testimony affidavits, as required by the pre-trial conference order, as such affidavits were due on June 1, 2021, the day of the bankruptcy filing and removal.[43]

There is also a great potential for unnecessary use of judicial resources.  As noted in the Gillespie Declaration, Judge Ostrager, the presiding judge in the State Court action, has extensive history with this matter.  He has held no less than 13 discovery conferences, along with determining a motion to dismiss, a motion to reargue, a motion for an attachment and competing motions for summary judgment, all of which were the subject of extensive briefing.

Indeed, Judge Ostrager noted his extensive knowledge of this case, stating:

> If you submit a pretrial memo or if you don't submit a pretrial memo, I don't need opening statements.  **Parties have been before me enough times in this case so that I'm quite familiar with what the issues in this case are.**  And the purpose of conducting the trial in this manner is to resolve the issues that are for the Court as expeditiously, efficiently and inexpensively as possible. (emphasis added).[44]

---

[41] Gillespie Dec., Exhibit GG (Defendants' May 28th letter).
[42] Gillespie Dec., Exhibit FF (Debtor's Application and Declaration of Scott D. Cousins).
[43] Gillespie Dec., Exhibit AA (April 29th and transcript, p. 10, lines 13-17).
[44] Gillespie Dec., Exhibit AA (April 29th transcript, pp. 8-9, lines 22-3).

Having a new court now get involved in this matter for the purposes of hearings and trials would lead to an unnecessary waste of resources as the State Court already has gained significant knowledge of this matter.

Finally, remand lessens the possibility of inconsistent results.  The State Court action could determine the liabilities of all Defendants, including liquidation of the claim against JDS Fourth for purposes of the bankruptcy.  Having all matters resolved in one action, by the judge who has an extensive history of over three years with this action, would avoid the possibility of inconsistent results by having the disputes between the parties resolved in two different forums -- the State Court and the federal bankruptcy court.

C.      Similar Cases Support Remand.

Factually similar caselaw also supports remand of the State Court action.  In Gassman v. Gassman, Griper & Golodny, No. 97 civ. 0093, 1997 WL 603439 (S.D.N.Y., Sept. 30, 1997), the bankruptcy petition and notice of removal were also filed on the last business day before trial.  In ordering remand, the court found that "it is highly likely that the bankruptcy petition was filed as a forum shopping device to avoid trial in the state court, since it was filed on the last business day before the trial was set to begin."  Based upon this conclusion and analysis of other remand factors, including that the complaints were filed in the state court long before the bankruptcy petition, the court abstained from hearing the removed case, remanding it to state court.  In so holding, the bankruptcy court stated, "Griper can hardly claim to have the equities on his side, however, since it is reasonable to conclude that he filed his bankruptcy petition in New Jersey on what was literally eve of trial to thwart the trial after significant preparation time had been expended by the parties and the state judiciary."  Id. at *3.

MEMORANDUM OF LAW IN SUPPORT – PAGE 23

Much like in <u>Gassman</u>, the equities favor Baltic and Tona.  JDS Fourth's actions here were clearly a tactic to delay the trial.  Indeed, the bankruptcy filing was made the day before trial and after Defendants' four prior failed attempts to push off the trial date.[45]  In addition, Defendants gained significant advantage by having Plaintiffs produce 99 pages of sworn direct examination affidavits, all while avoiding having to produce such affidavits themselves.

Further, the bankruptcy filing and petition of JDS Fourth is also suspect.  In its petition, JDS Fourth lists a mere eight creditors for its bankruptcy.[46]  Two of the creditors are Plaintiffs, Baltic and Tona.  Another creditor is JDS Fourth's partner, Largo, who is suing JDS Fourth, Stern and JDS Construction, among others.[47]  Indeed, as stated previously, Largo has moved to dismiss the JDS Fourth bankruptcy as being filed without Largo's required approval and as being filed in bad faith.[48]

The other two large creditors set forth on the petition are Kasowitz Benson Torres, LLP (KBT) in the amount of $309,292, and FTI Consulting (FTI) in the amount of $178,922.  KBT is the law firm handling the defense of Defendants in the State Court action and continues to represent Defendants.  FTI is the expert witness retained for their analysis and testimony in the State Court action.  Notably, bills from both FTI and KBT have been produced in the State Court action.  The bills for KBT, totaling 18 pages, were all addressed to "Michael Stern, managing partner, JDS Development Group," not JDS Fourth.  Likewise, the bills from FTI, totaling 5 pages, were addressed to "Nithin Jayadeva, JDS Construction Group, LLC," not JDS Fourth.[49]  Thus, none of the KBT and/or FTI bills were addressed to JDS Fourth.  Simply put, according to the 23 pages of

---

[45] Gillespie Dec., ¶¶37-49.
[46] Gillespie Dec., Exhibit HH (Petition).
[47] Gillespie Dec., Exhibit JJ (Largo Docket).
[48] Gillespie Dec., Exhibit KK (Largo's motion to dismiss).
[49] Gillespie Dec., Exhibit G (Defendants' legal and consulting bills).

<u>MEMORANDUM OF LAW IN SUPPORT – PAGE 24</u>

bills produced in the State Court, neither KBT nor FTI actually indebted JDS Fourth to become such a creditor.

Likewise, JDS Fourth did not make payments of the bills produced in the State Court action. Payments were made from Property Owner, by account number xxxx7133, with payments for these bills made in February, March, June, November and December 2020, and February and April 2021.[50] This obviously calls into question whether KBT and FTI are actually "creditors" of JDS Fourth, particularly because KBT continues to represent all Defendants.

Likewise, in the matter of Little Rest Twelve, Inc. v. Visan, 458 B.R. 44 (S.D.N.Y. 2011), the Court found that equitable remand and abstention was appropriate. In Little Rest Twelve, the state court action had proceeded to trial and was presided over by Judge Fried, who set summations on a trial issue for April 5th, stating "I have spent some time on this and am looking forward to the summations with great anticipation and when I am finished, I expect to render a decision which will resolve what I consider to be disputed issues." Id. at 53. On April 4th, the day before summations, the debtors filed a Notice of Removal of the State Court action, not permitting Judge Fried to render his decision. The bankruptcy court, after review, found that the factors supported both permissive abstention and remand. In so holding, the bankruptcy court found "the removal petitions produce an unmistakable impression of forum-shopping on the part of old management, which appeared to remove the cases to avoid the state court forum that it had originally chosen shortly before the state court judge was about to issue a decision in the Visan case." Id. at 59.

There can be no question that Defendants have engaged in forum shopping in this action. The State Court action has been pending since October 2018 and has been hotly contested, including various discovery conferences before Judge Ostrager in connection with Defendants'

---

[50] Gillespie Dec., Exhibit I (bank statements).

non-compliance with several discovery orders.  Indeed, in a July 1, 2020 conference, Judge

Ostrager, in speaking about Defendants, found "I believe you are playing games.  It has been at

least six conferences of discussions and orders directing you to explain with precision how much

money has come in, how much money has gone out and to whom it has gone out to.  There is

nothing complicated about that."[51]  The Court also found that "I have lost patience with the

Defendants in this case.  And I do not believe that you're conducting this case in good faith."[52]

Moreover, the parties had been aware of the June 2, 2021 trial date for over seven months,

since it was set on October 27, 2020.[53]  Thereafter, Defendants made no less than four attempts to

delay the trial date and all attempts failed.[54]

On April 29, 2021, the Court held a final pre-trial conference which set forth important

dates for the filing of pre-trial submissions, including a joint exhibit list, list of witnesses, pre-trial

memoranda, proposed findings of fact and, most importantly, affidavits for direct examination of

all witnesses.  Plaintiffs were to file their affidavits on May 28, 2021, and Defendants were to file

their affidavits on June 1, 2021, with the trial to commence the next day, June 2, 2021.[55]

Plaintiffs submitted the joint exhibit list along with filing a list of witnesses, deposition

testimony to be read, pre-trial memoranda and proposed findings of fact on May 19, 2021, as

required.  Notably, Defendants only participated in conferring on the joint exhibit list and filed a

witness list.  Defendants curiously did not file any (1) proposed findings of fact, (2) designation

of deposition testimony to be read or (3) pre-trial memorandum.

---

[51] Gillespie Dec., Exhibit R (July 1, 2020 transcript, p. 40, lines 17-21).
[52] Id., p. 41, lines 7-9.
[53] Gillespie Dec., Exhibit U (October 23, 2020 Stipulation).
[54] Gillespie Dec., ¶¶37-50; Exhibit V (January 26, 2021 Status Conference Order); Exhibit AA (April 29, 2021 transcript, p. 11); Exhibit BB (Defendants' May 10, 2021 letter).
[55] Gillespie Dec., Exhibit AA (April 29, 2021 transcript, p. 10, lines 13-17).

Thereafter, on Friday, May 28, 2021, Plaintiffs filed seven affidavits of direct examination of the witnesses, totaling 99 pages.  On that very same day, Friday, May 28th, Defendants wrote to the Court at 5:13 p.m. belatedly objecting to certain subpoenas and requesting the Court "to require Plaintiffs to proceed to trial."[56]  There was no reference to any intended bankruptcy filing or removal even though that would occur on Tuesday, following the Memorial Day holiday, the next business day and the last day before trial was to commence.  Notably, JDS Fourth has acknowledged that on or prior to May 28, 2021, it engaged bankruptcy counsel in Delaware, Cousins Law LLC,[57] intending to file for bankruptcy, while on the same day asking the State Court to inform Plaintiffs to proceed to trial.  Clearly, Defendants purposely held back the bankruptcy filing until June 1st so it would receive all of Plaintiffs' direct testimony affidavits, while at the same time, not having to produce its own direct testimony affidavits.  Simply put, the "bankruptcy" strategy was planned well before the June 1st filing, but Defendants held back to secure a litigation advantage.

Indeed, as noted previously, Defendants waited until 10:38 a.m. on Tuesday, June 1, 2021, less than 24 hours before trial, to file the Notice of Removal, after filing the bankruptcy petition. Defendants did not, as had been required prior to removal, file affidavits for their witnesses for direct examination for the trial that was to occur the very next day.

The only logical conclusion is that Defendants' tactic all along was to avoid trial.  They made multiple attempts to do so and, when they failed, filed the bankruptcy proceeding and Notice of Removal, waiting first to secure detailed affidavits of Plaintiffs' witnesses to give them an additional advantage.

---

[56] Gillespie Dec., Exhibit GG (Defendants' May 28, 2021 letter).
[57] Gillespie Dec., Exhibit FF (Debtor's Application (see ¶18) and Declaration of Scott D. Cousins (see ¶11)).

MEMORANDUM OF LAW IN SUPPORT – PAGE 27

Accordingly, the equities clearly favor permissive abstention and the remand of this proceeding as this is a clear case of Defendants' forum shopping and hoping to adjourn the trial after their prior attempts were not successful. This Court must not permit Defendants to engage in conduct designed only to delay trial at great prejudice to Plaintiffs. Plaintiffs respectfully submit that there are more than adequate grounds for an equitable removal under 28 U.S.C. §1452(b) and/or permissive abstention under 28 U.S.C. §1334(c)(1).

D.      Costs, Expenses and Attorney's Fees Should be Awarded to Plaintiffs.

28 U.S.C. §1447(c) provides, in pertinent part, that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." As found by the Second Circuit in Circle Industries USA, Inc. v. Parke Construction Group, Inc., 183 F.3d 105, 109 (2d Cir. 1999), an order "providing for attorneys fees when granting a motion to remand serves the purpose of deterring improper removal." See also Greenidge v. Mundo Shipping Corp., 60 F. Supp.2d 10, 12 (E.D.N.Y. 1999) ("[w]hile the simplicity of [the removal] procedure facilitates removal, it also exposes a plaintiff to the possibility of abuse, unnecessary expense and harassment if a defendant removes improperly, thereby requiring plaintiff to appear in federal court, prepare motion papers and litigate, merely to get the action returned to the court where the plaintiff initiated it."), citing Circle Industries USA Inc., supra.

"A case need not be removed improvidently or in bad faith for costs to be appropriate." See Little Rest Twelve, 468 B.R. at 61, citing Morgan Guaranty Trust Company of New York v. Republic of Palau, 971 F.2d 917, 923 (2d Cir. 1992). See also Departmental Disciplinary Committee v. Shapiro (In Re Friedman & Shapiro P.C.), 185 B.R. 143 (1995) (finding that "[t]he award of costs under §1447(c) is discretionary and does not require a finding that the removant

acted in bad faith").  "Instead, it is appropriate for a Court to consider the 'overall fairness given the nature of the case, the circumstances of the remand, and the effect on the parties'."  <u>Little Rest Twelve</u>, 458 B.R. 44 at 61-62, *citing* <u>Morgan Guaranty Trust Company of New York</u>, *supra*.

In any event, in this case it is clear both that the removal was improper and that fairness dictates an award of costs to Plaintiffs.  Indeed, this is made clear by the following previously discussed factors:  (1) Defendants waited until less than 24 hours before trial to file bankruptcy on behalf of JDS Fourth; (2) several of the creditors relied upon to support the bankruptcy were entities that did not send invoices to, and were not paid by, JDS Fourth; (3) JDS Fourth is a special purpose entity founded and designed only to hold a 50 percent interest in the Joint Venture that lacks any assets or even a bank account; (4) the filing was timed, less than 24 hours before trial, to provide Defendants with a significant advantage by requiring Plaintiffs to prepare for trial and allowing Defendants to secure seven detailed direct examination affidavits while avoiding producing such affidavits of their own; and (5) Defendants had previously retained bankruptcy counsel on or prior to May 28th, but concealed their intention to file for bankruptcy from Plaintiffs and the State Court while nonetheless simultaneously on May 28th indicating their intention to move forward with trial.

These factors demonstrate that the bankruptcy filing, and subsequent removal, was nothing more than a tactic designed, after four prior unsuccessful attempts, to avoid trial.  Such tactics, disingenuous at best, should be discouraged, and Plaintiffs respectfully request the Court exercise its discretion here to award costs, expenses and attorney's fees to Plaintiffs as well as granting Plaintiffs' motion to remand and/or for permissive abstention.

<u>MEMORANDUM OF LAW IN SUPPORT – PAGE 29</u>

## IV.
## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectively request that their motion be granted in its entirety and that the Court issue an order (i) pursuant to 28 U.S.C. §1452, remanding this action in its entirety back to the State Court, to be heard by the Honorable Justice Barry Ostrager; (ii) pursuant to 28 U.S.C. §13374 for permissive abstention; (iii) abstaining from hearing this action pursuant to 28 U.S.C. §1331, (iv) declaring that, upon remand, 11 U.S.C. § 362 shall no longer affect prosecution of this action so as to permit the State Court to proceed to final resolution of this action; (v) in the alternative, remanding Plaintiffs' claims against non-debtor defendants, Michael Stern and JDS Construction Group, LLC, to the State Court; and (vi) granting costs, expenses and counsel fees under 28 U.S.C. §1447(c), along with whatever additional relief the Court deems just and proper.

Dated:  East Meadow, New York
             June 30, 2021

BALTIC FOURTH LLC and TONA
CONSTRUCTION & MANAGEMENT LLC

*s/*

By:_____

Stephen J. Gillespie

Stephen J. Gillespie, Esq.
Christopher J. Sheehy, Esq.
Michael F. McGowan, Esq.
WESTERMANN SHEEHY
SAMAAN & GILLESPIE, LLP
90 Merrick Avenue, Suite 802
East Meadow, New York 11554
516-794-7500

Counsel for plaintiffs,
Baltic Fourth LLC and
Tona Construction & Management LLC

<u>MEMORANDUM OF LAW IN SUPPORT – PAGE 30</u>